**SRI INTERNATIONAL, Appellant,**

v.

**MATSUSHITA ELECTRIC CORPORATION OF AMERICA and Matsushita Electric Industrial Co., Ltd., Appellees.**

**Appeal No. 84–1637.**

United States Court of Appeals,
Federal Circuit.

Oct. 16, 1985.

Edward B. Gregg, Gregg, Caplan & Higgins, Menlo Park, Cal., argued for appellant.

Daniel Ebenstein, Amster, Rothstein & Engelberg, New York City, argued for appellees. With him on brief were Morton Amster and Anthony F. LoCicero, New York City.

Before MARKEY, Chief Judge, FRIEDMAN, RICH, DAVIS, BALDWIN, KASHIWA, BENNETT, SMITH, NIES, NEWMAN and BISSELL, Circuit Judges.*

---

* This case was argued before a panel consisting of MARKEY, *Chief Judge,* KASHIWA and NEWMAN, *Circuit Judges.* The need for clarity in the law has prompted this court to consider this case *in banc.*

MARKEY, Chief Judge.

SRI International (SRI) appeals from a final judgment of the United States District Court for the Northern District of California granting summary judgment of non-infringement to Matsushita Electric Corporation (MEI). 591 F.Supp. 464, 224 USPQ 70 (1984). We reverse.

## BACKGROUND

Familiarity with the district court's opinion being assumed, only those factors necessary to an understanding of this court's decision will be discussed here.

The district court's opinion contains an excellent explication of the technology involved, reflecting a clear recognition of the undisputed fact that the filter and camera embodiment *described in the specification* of SRI's United States Patent No. 3,378,633 (the '633 patent) issued to SRI as assignee of the inventor Dr. Albert Macovski on April 16, 1968, *operate* somewhat differently from the MEI filter and camera accused of infringement.

### The Claims

Each claim charged to have been infringed is drawn to a structure. Because of its central role as the broadest, claim 1 is set forth:

1. A spatial filter for affording a monochrome recording from which upon subsequent scanning, information for reproducing an image in color of the object photographed may be derived, said filter comprising a first grid of parallel spaced lines having the color of a subtractive primary, a second grid relatively angularly superimposed over all of the said first grid, said second grid having parallel spaced lines having the color of another subtractive primary, each grid having the same line density.

Claim 2 depends from claim 1, adding only "the relative angle between the first and second grids is 45°." Claim 7 and dependent claim 8 are drawn to a camera in combination with the filter of claim 1. Claim 9 and dependent claim 10 are drawn

to "apparatus for generating the color representative electrical signals required for a color television receiver to reproduce a scene in color," and include the filter of claim 1.

Claim 3 was not charged to have been infringed. It is set forth because it affects the question of claim interpretation:

3. In a camera of the type wherein light from a scene being photographed is focused by a lens on black and white, monochromatic sensitive film, the improvement for affording a recording of the color information in the scene being photographed on said film in a manner so that said color information may be electronically derived therefrom comprising a filter adjacent said film, said filter having a first grid of *vertical* spaced lines which are colored cyan, and superimposed over all of said first grid a second grid having its lines at a 45° angle to the lines of the first grid, said second grid lines being yellow in color, both said grids having the same line density. [Emphasis added.]

### Operation

The district court's Memorandum Opinion included helpful illustrations, that of SRI's filter being based on Figure 1 of the '633 patent drawings. Figure 1 shows an embodiment of the invention set forth in claim 1, in which one grid is superimposed over all of the other grid, the equi-width stripes of one are vertical and those of the other are angled to the vertical. In the operation of that embodiment, the horizontal distance travelled by the scanning beam in a single pass ("scan line") across and between angularly disposed stripes is greater than that across and between vertical stripes. Thus, the frequency range generated by interruptions in a single pass across the angular grid is lower than that across the vertical grid, and two basically discrete (red and blue) carrier frequency ranges are generated at that point. The frequencies are then decoded by low and band pass filters.

In the MEI filter, one grid is superimposed over all of the other grid and both grids have equi-width stripes, but the stripes of the two grids are at equal and opposite angles to the vertical. In operation, the horizontal distance travelled by the scanning beam in a single pass across and between stripes of both grids is the same, and the red and blue carrier frequency ranges thereby generated are the same at that point. However, the phase difference between successive, timed scanning passes produces a concentration of red and blue components at alternating, overlapping, or interleaved frequencies. To delay successive passes and decode the interleaved frequencies, MEI employs a 1-Hertz (1–H) delay comb line filter.[1]

### District Court Proceedings

#### (a) Preliminaries

On July 19, 1982, SRI filed a complaint and jury demand, alleging MEI's willful infringement of claims 1, 2, and 7–10 and seeking treble damages, costs, attorney fees, and an injunction. That same day, the district court scheduled a status conference for October 22, 1982. On September 29, 1982, MEI filed answer, alleging invalidity, unenforceability, and non-infringement, and a counterclaim for declaratory judgment of invalidity and non-infringement.

In April, 1983, the parties filed extensive briefs.

On October 19, 1983, the district court issued a comprehensive Second Order for Pretrial Preparation, setting April 30, 1984 for "Trial before the Jury".

The October 19, 1983 order required the filing of exhibits, witness lists, summaries of all proposed testimony, statements of experts' theories with conclusions and bases therefor, experts' curriculum vitae, and reports prepared for testimony. The order form also contained a requirement applicable "In non-jury cases", i.e., the filing of a written narrative statement of the proposed direct testimony of each witness.

The October 19, 1983 order also required the filing of objections to testimony or exhibits, with the ground for each objection.[2] Pursuant to another order of the same date, the parties were required to prepare statements of fact which each party contends should be submitted to a jury for determination.

In response, on January 20, 1984, counsel for SRI wrote the court, listing among the issues for the jury the question of whether MEI's filter is "so far changed in principle" that SRI's and MEI's filters are different inventions (MEI's position) or different versions of the same invention (SRI's position), quoting *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136 (1898).

On February 2, 1984, counsel for MEI wrote the court, saying that: no issue required jury determination; the issue is whether the claims can cover MEI's filter; that issue is one of claim language scope and a matter of law; and whether MEI's camera functions in a basically different manner is a legal question, citing *Kalman v. Kimberly Clark Corp.*, 713 F.2d 760, 218 USPQ 781 (Fed.Cir.1983).

#### (b) February 10, 1984 Pretrial Conference

A February 10, 1984 pretrial conference to narrow the issues began with a late attempt by MEI's counsel to bar the inventor (Dr. Macovski) as an expert witness because of his financial interest in the outcome of the litigation. MEI's counsel said they had originally considered objecting on the ground that "[t]he subject matters [sic] as to which Dr. Macovski is going to testify is so far outside of anyone's real world experience that it's almost impossible to evaluate without appropriate technical

---

1. SRI has consistently maintained, and it is apparently undisputed, that there must be two frequencies separated at some point; otherwise no filter will work.

2. Each side filed numerous objections. The record does not reflect that the court ruled on all of those objections.

background and credentials," and was therefore not appropriate "to go to a jury." [3] That objection was not made. The court overruled the objection with respect to financial interest on the ground that SRI would be prejudiced if denied its witness on the eve of trial.

The court then turned to the purpose of the conference, i.e., determining "whether there are any issues here involving conflicts of facts." Having read the papers then on file, the court concluded:

> It seems to me, under the particular recent decisions under the Federal Circuit, it's a pure question of deriving ultimate facts from undisputed evidence which is properly done by the judge. Mr. Gregg, I have read your papers carefully, but I don't see any factual issues that would be proper for a jury.

SRI's counsel then said: "That if there are no evidentiary facts in dispute, this is a case that is ripe for summary judgment. And I would suggest under those circumstances and with your Honor's consent, that the defendants bring a motion for summary judgment." When the judge asked whether SRI wished also to bring a summary judgment motion, SRI's counsel said it did not because counsel believed there were factual disputes present.

Asked to identify the disputes, SRI's counsel responded:

> The dispute with respect to infringement largely evolves around this: There is no question but what the words of the claim, as we say, "read on," cover, define, not only the structure in the 633 patent, which is in suit here, but the structure which the defendants used.
>
> And in accordance with the Supreme Court's decision in Graver vs. Linde, you look to the words of the claim, and do you determine whether or not they cover what the accused device is; and if it does, infringement is made out, and that is the end of it.

But there is another side of the coin, and the other side of the coin is this: That if the invention, if whatever the defendant has, if his device is so utterly different in principle from the device which is described in the patent, then regardless of the wording of the claims, the claims have not validly covered it. And that is the issue with respect to infringement, the principle [sic] issue as to whether or not the system which is used by the defendants in this case is so different in principle that it's an altogether different invention. One is an apple; the other is an orange.

And that seems to me to be mainly a fact of determination, and so on down the line.

To that statement the court responded:

> Well, I don't think so.... [I]f the issue in this case is whether a thing which is colored orange, has [a] peel about an eighth-inch thick, ... and once it's peeled, it's sectioned, those facts are undisputed. The question is whether the ultimate fact may be derived from that evidence that it is an orange.
>
> That doesn't strike me as a jury issue. That strikes me as an issue that is appropriate for a judge to decide, particularly if oranges are rather obscure kind [sic] of things in the common experience of a jury. There is no dispute it has certain kinds of seeds inside. There is no conflict, in other words, in the evidence. There is only a conflict in the interpretation of the evidence.
>
> It strikes me that is appropriate for a judge to decide. Whether it should be decided on summary judgment or not is another question. I wouldn't keep anybody from making a motion for summary judgment, but it would be useful in this case for the court to hear the testimony of the experts because I think the court needs some enlightenment on some rather technical questions.

---

**3.** Seeking to bar the witness entirely, MEI's counsel did not say whether the *court* had the "appropriate technical background and credentials." In the end, MEI accepted "summary judgment", though the court heard no witness, but read and evaluated the written narrative statements of witnesses and Dr. Macovski's affidavit.

After some discussion of evidence of obviousness, the court stated:

> I just don't see any dispute here, and it seems to me that these are all legal issues, that is, they are issues of ultimate fact concerning the application of principles such as obviousness, anticipation, infringement, to undisputed facts.[4]

> Of course, Mr. Gregg, the two sides will present different evidence, but that doesn't mean there is any conflict in the evidence. And in the absence of an evidentiary conflict, I don't see a jury issue in a patent case.

MEI's counsel at that point said he would move for summary judgment "if it were done in a manner which I think would be permitted by the rules, where on the motion the court could hold an evidentiary hearing which would permit the court to hear the experts at least, and in a live situation develop an education as to the subject matter." [5]

The court then described its procedure in bench trials, under which, to preclude surprise and facilitate preparation for trial, written narrative statements of testimony are exchanged, and the record after trial would become those narrative statements plus testimony adduced at trial. The court added:

> And that way the record will be a combination of the narrative statement of testimony, plus the testimony adduced here. Now, that is not summary judgment, but it is a bench trial, and it anticipates the testimony and provides everybody with a complete statement of testimony and exhibits in advance.

> Now, that will be my way of proceeding in this case. I don't think it's appropriate for summary judgment just because I would want the live witnesses. But I do think we can resolve these questions fairly and intelligently in a reasonable fashion in this way, and also I think more economically and expeditiously.

> Usually when trials are conducted in this fashion, they don't take as long as people anticipate.

The February 10, 1984 conference ended with the setting of March 30 for submission of pretrial briefs and April 30 for a bench trial.[6]

On February 23, 1984, the court issued a Third Order for Pretrial Preparation and Trial in which it denied SRI's request for jury trial and ordered the bench trial discussed in the foregoing quote:

> It appearing that there are no disputed issues of fact requiring determination by a jury; it is hereby

> ORDERED, ADJUDGED, AND DECREED that the liability phase of this case shall be tried to the Court in accordance with the following schedule ...

The order then repeated the bench-trial requirement for filing narrative statements of testimony, exhibits, and objections.

### (c) April 13, 1984 Pretrial Conference

On April 13, 1984, at what proved to be the last pretrial conference and last courtroom event, the court conducted an extended dialogue with SRI's counsel, beginning with the court's demand that counsel state the "essence" of the '633 patent and "the novel element on the basis of which that patent was issued." The court asked SRI's counsel whether the assertions in MEI's brief (claims are limited to filters so operat-

---

**4.** The district court did not reach the validity issue. Nor do we. Nothing here said should be taken as affecting in any manner the determination of that issue. Similarly, we express no view on whether there has been an infringement, a fact question not determinable on this appeal. As indicated in the text, the sole issue before us is the propriety of summary judgment.

**5.** Evidentiary hearings to determine whether a genuine issue of material fact is present are appropriate on summary judgment motions. *See* 6 MOORE'S FEDERAL PRACTICE ¶ 56.-11[8] (1985).

**6.** After the court stated at the February 10, 1984 conference, that it would conduct a bench trial, SRI's counsel did not orally insist on SRI's right to a jury trial. On the record here, all concerned appear to have expected at this point that there would be a bench trial.

ed that the angle difference of the stripes creates different frequencies) stated "the essence of the patent".

Counsel for SRI began correctly by stating the structural limitations of the claims. When the court said the "essence" was "the difference in the angles of the two sets of stripes creates different frequencies for the transmission of red and blue color," counsel said "stripes at an angle to one another and creating different frequencies" was old and that the "novel feature" was the equal width and spacing of the stripes.

Pressed by the court on whether "the basis on which the patent was issued" was "two sets of stripes being at an angle to one another" and "for the purpose of generating different frequencies," SRI's counsel finally, and inexplicably, said, "[t]hat's correct." [7]

The court then said MEI's filter does not generate frequency differences. When SRI's counsel said it did, the court demanded an explanation. Pleading that inventor Macovski could explain it better, counsel said MEI's 1–H delay resulted in frequency differences without which no camera would work.

Pointing to a statement in a brief filed a year earlier (April 29, 1983) by SRI's counsel (that MEI's was a "phase" system), the court deemed counsel's statement in the April 13, 1984 conference (that MEI's system generated two frequencies, albeit in a different way) an improper and possibly punishable change of position.[8]

Counsel said he had learned more during the year, and that his expert witnesses and a paper by MEI's employee, Nakabe, would at trial show the correctness of his present statement.

When the court pointed out that "tenth grade geometry" shows no difference in spacing across and between MEI's stripes, SRI's counsel agreed, saying that, "[t]here is no frequency difference on a given scan line," but that "MEI's 1–H delay produced frequency differences."

When the court asked whether the real issue was whether the '633 patent "protects a system" which generates color differences by a time delay in rate of scanning between different lines, counsel answered, "Yes." The court then asked whether the patent or file wrapper said anywhere that "an essence or novel idea in this patent to be protected is the generation of frequency differences through time delays." Counsel for SRI sought to answer by citing references in the specification to frequency overlap.

Invited to comment, MEI's counsel simply agreed, in three sentences, with what the court had been saying, i.e., that use of "phase" and "frequency" was mere "semantics" and that nothing in the '633 patent suggests MEI's "technique", at which point the court said, "Well, I don't see why I shouldn't grant summary judgment in this case."

Referring repeatedly to the statement about "phase" in the year-old brief of SRI's counsel, the court rejected counsel's promise of what Dr. Macovski would show at trial and counsel's assertions that those

7. Reliance on a finding that a "novel element", or "essence" (or "gist", or "key") of a *structural* invention lies in the *operation* of a specification-described embodiment of the *claimed* structure would render meaningless the statutory requirement for claiming, 35 U.S.C. § 112, the statutory requirement for treating claims individually, 35 U.S.C. § 282, and the entire examination system centering on the allowance or rejection of claims. Inexplicably, SRI's counsel did not present these statutory considerations firmly to the district court at the April 13, 1984 pretrial conference.

8. "Phase" and "frequency" are differing electrical phenomena. That difference appears to

have influenced the district court. Counsel for SRI did not point out to the court that claim 1, for example, says nothing whatever about "phase" or "frequency", but calls only for "affording a monochrome recording from which upon subsequent scanning, *information* for producing an image in color of the object photographed may be derived." (Emphasis added.) Whether those skilled in the art would immediately recognize that "information" is equally applicable to "phase" and "frequency" is a contested issue (see Narrative Statement of Ball, App. Vol. II, 527–28) resolvable by live witnesses at trial. It is not resolvable on this appeal.

skilled in the art would immediately on reading the '633 patent recognize the availability of what counsel called the minor changes made by MEI.

The court then asked MEI's counsel whether he desired a trial or summary judgment. MEI's counsel responded by offering to have his narrative witness statements sworn. The court said there was no need for any statements, because MEI's exhibits and the year-old statement of SRI's counsel removed all controversy.

Recognizing that it had surprised SRI, the court set a schedule for briefing on summary judgment. SRI accompanied its brief with an affidavit of Dr. Macovski. MEI filed no affidavit.

On August 1, 1984, after considering counsels' voluminous submissions,[9] the district court entered summary judgment in favor of MEI.

### Issue

Whether the district court erred in granting summary judgment of non-infringement.

### OPINION

#### (1) Introduction

◼ The Federal Rules of Civil and Appellate Procedure and of Evidence are and should be applied in patent cases no differently from their application in any other type of case. Hence summary judgment under Rule 56, Fed.R.Civ.P., is entirely appropriate, in a patent as in any other case, where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. *See Molinaro v. Fannon/Courier Corp.*, 745 F.2d 651, 653–54, 223 USPQ 706, 707 (Fed.Cir. 1984); *Chore-Time Equipment, Inc. v. Cumberland Corp.*, 713 F.2d 774, 778, 218 USPQ 673, 675 (Fed.Cir.1983). The movant bears the burden of demonstrating absence of all genuine issues of material fact, *Cooper v. Ford Motor Co.*, 748 F.2d 677, 679, 223 USPQ 1286, 1287–88 (Fed.Cir.1984), the district court must view the evidence in a light most favorable to the nonmovant and draw all reasonable inferences in its favor, *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962), *Martin v. Barber*, 755 F.2d 1564, 1566, 225 USPQ 233, 234 (Fed.Cir.1985), and must resolve all doubt over factual issues in favor of the party opposing summary judgment, *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 973, 226 USPQ 5, 7 (Fed.Cir. 1985).[10]

◼ The party opposing the motion must point to an evidentiary conflict created on the record; mere denials or conclusory statements are insufficient. *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.*, 731 F.2d 831, 836, 221 USPQ 561, 564 (Fed.Cir.1984). Because, however, infringement is itself a fact issue, a district court must approach a motion for summary judgment of infringement or non-infringement with a care proportioned to the likelihood of its being inappropriate. *D.M.I., Inc. v. Deere & Co.*, 755 F.2d 1570, 1573, 225 USPQ 236, 238 (Fed.Cir.1985); *Palumbo v. Don-Joy Co.*, 762 F.2d 974, 226 USPQ at 8.

◼ Though speedy and inexpensive, summary judgment is nonetheless a "lethal weapon" capable of "overkill". *Brunswick v. Vineburg*, 370 F.2d 605, 612 (5th Cir. 1967). *See generally* Louis, *Federal Summary Judgment Doctrine: A Critical Analysis*, 83 Yale L.Rev. 745 (1974). It denies the non-movant its "day", i.e. a trial, in court. Moreover, experience has shown that a trial often establishes facts and inferences not gleanable from papers submitted pre-trial. Further, a reversal of summary judgment on appeal is not dispositive, but merely remits the case for trial.

9. 242 exhibits and narrative statements were filed, along, apparently, with six briefs. The appendix on appeal consists of over 1,746 pages.

10. The record does not indicate that MEI actually filed a motion for summary judgment. MEI appears to have merely acquiesced when the district court announced, at the end of the April 13, 1984 pretrial conference, an intention to grant summary judgment (unless convinced otherwise by SRI's forthcoming brief).

If reversal be error, that error will manifest itself at close of the non-movant's case, when the district court may direct a verdict or enter judgment accordingly.

In the present case, the admirable and extensive pretrial preparation system designed and vigorously managed by the district court, moved from preparation for a jury trial, through determination of whether the jury demand should be granted, to preparation for a bench trial, to the court's examination of unsworn counsel, to the court's study of exhibits and unsworn narrative statements, and finally to a grant of summary judgment. Counsel did not supply the clear, candid, and uncompromising explication of the law required to protect the pretrial preparation system in this instance from error.

As was stated in *Cable Electric Products, Inc. v. Genmark, Inc.*, 770 F.2d 1015 (Fed.Cir.1985), "the circumstances appropriate to summary judgment are those in which a district court is able to conclude that, with regard to any factual issues material to granting judgment as a matter of law, no genuine dispute exists." Here

there was no dispute on the structure of MEI's filter and camera, and no dispute on the manner in which that structure is operated, but there was a dispute, as discussed *infra*, on whether that manner of operation meant that MEI's structure was so far changed in principle that it performed the same or similar function as the claimed invention in a substantially different way. As discussed, *infra*, that disputed question raises a genuine issue of material fact and the answer to that question controls the issue of infringement in this case.

Focusing exclusively on the way the structure of the Figure 1 embodiment in the specification operates, the district court allowed that focus to control its claim interpretation and its grant of summary judgment. In so doing, it erred.

### (2) The Claims Read on MEI's Structure

■ The claims are structural, not method, claims. MEI did not in its brief before us concede that the claims as written read directly on its filter and camera.[11] Because MEI's argument is based entirely on its

---

**11.** At oral argument before the panel here, the following colloquy occurred:

> THE COURT: Now the next question. If you ignore the specification—which, of course, is another question, hypothetical, but if you ignore it—don't you have literal infringement here, don't [the claims] read right on [the MEI device]?
> COUNSEL FOR MEI: Oh, I suppose if you ignore the specification ...
> THE COURT: That's the hypothetical.
> COUNSEL FOR MEI: Then you can take a meaning, as the judge said, of relatively angularly superimposed that would mean crossed at any angle.
> THE COURT: Yes.
> COUNSEL FOR MEI: Certainly you would do that, but I think what the judge, and I think going into this on that issue, we had the harder case to present to the district judge because what we had to do in order to show him what that language meant was teach him the art, go through the specification, show him the prior art, go through the prosecution history, which gives that terminology a special meaning. *I agree, your honor, without the special meaning created by the prosecution here and the prior art, that language could as well read on the MEI system as the SRI system.* [Emphasis added.]

To understand what is being claimed in each claim one must often refer to the specification, prosecution, and prior art. One must do so to resolve any ambiguity in claim language. Use may be made by either party of materials extraneous to the words of a claim, to give them a "special meaning" which will support an assertion of actual infringement/non-infringement under the doctrines of equivalents/reverse equivalents. That use does not change the answer to the question of whether the claim language *as written* "reads on" the accused device, which is synonymous with what has long been called *"literal* infringement". As the text makes clear, determination that the claim words read literally on the accused device is but an "initial hurdle". *See Autogiro Co. of America v. United States*, 384 F.2d 391, 399, 181 Ct.Cl. 55, 155 USPQ 697, 704 (1967).

Total candor on both sides could have produced a stipulation at the outset that the *sole* infringement issue before the district court, as explained *infra*, was whether the structure of MEI's filter and camera was "so far changed in principle" that it "performs the same or a similar function in a substantially different way." *Graver Tank & Mfg. Co., Inc. v. Linde Air Prods. Co., Inc.*, 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950).

"technique", i.e., on how its structure and that disclosed in Figure 1 of SRI's specification (or SRI's commercial embodiment) are *operated*, a concession that its structure falls literally within the words of the structural claims in suit would have saved time and cost for all concerned by focusing on the sole *actual* infringement issue present, which, as discussed below, centers on the so-called "reverse doctrine of equivalents", i.e. no infringement in law, in spite of literal correspondence with the claim language, because the product or process alleged as an infringement is not actually the invention patented.

The factual issue is whether MEI's filter and camera infringe properly interpreted claims. *Fromson v. Advance Offset Plate, Inc.*, 720 F.2d 1565, 1569, 219 USPQ 1137, 1140 (Fed.Cir.1983). Nothing in the present record would justify a determination that *literal* correspondence with claim 1, for example, is avoided by a composite filter structure formed of grids with equi-width stripes superimposed in their entireties at equal and opposite angles to the vertical to derive information for reproducing an image in color, i.e., the MEI filter.

■ The language of the claims themselves is clear, definite, and unambiguous. It reads directly, unequivocally, and word-for-word on MEI's structure. As above indicated and as the district court correctly noted, there is *no factual dispute* concerning the structure of MEI's filter. It is undisputed that MEI's filter employs "relatively angularly superimposed" grids. The asserted claims, as the district court appeared to sense, are therefore literally met. If literal correspondence with the language of the claims were the sole consideration, SRI would on the present record be entitled to summary judgment, because there is *no issue* of genuine material fact that could affect that consideration.

Determination of actual infringement is not in every case, however, limited to literalism. An accused infringer, as here, may argue that the claim language, as properly interpreted, does not actually read on his device. *See Leesona v. United States*, 530 F.2d 896, 906, 208 Ct.Cl. 871, 887–88, 185 USPQ 156, 163 (*aff'd* 192 USPQ 672) (1976) ("more than a literal response to the terms of the claims must be shown to make out a case of infringement"). Where, as here, a defendant says the claim language, as interpreted in light of the specification, prosecution history, and prior art, does not actually read on his device, claim interpretation is required. If the presently asserted claims must be interpreted as limited to a structure that is operated in the precise manner in which Figure 1 of the specification is operated, a structure not operated in that manner would not be an actual infringement. As appears below, however, nothing of record requires that the asserted claims be so limited.

### (3) Claim Interpretation

■ Claim interpretation or construction is a legal matter subject to review free of the clearly erroneous standard applicable to fact findings. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 956, 220 USPQ 592, 596 (Fed.Cir.1983); *Fromson, supra*, 720 F.2d at 1569, 219 USPQ at 1140. In construing claims, the prosecution history is a useful tool, *McGill Inc. v. John Zink Co.*, 736 F.2d 666, 673, 221 USPQ 944, 949 (Fed. Cir.1984), as is the patent specification, *Fromson*, 720 F.2d at 1569, 219 USPQ at 1140.

■ A claim is construed in the light of the claim language, the other claims, the prior art, the prosecution history, and the specification, *not* in light of the accused device. Contrary to what MEI's counsel wrote the district court, claims are not construed "to cover" or "not to cover" the accused device. That procedure would make infringement a matter of judicial whim. It is only *after* the claims have been *construed without reference to the accused device* that the claims, as so construed, are applied to the accused device to determine infringement. *See Palumbo v. Don-Joy Co.*, 762 F.2d at 974, 226 USPQ at 8.

### (i) Prosecution History [12]

Responding to the examiner's initial rejection of certain claims in view of Kell, U.S. Patent No. 2,733,291, SRI entered extended Remarks in which it distinguished Kell on a number of different bases. Among those Remarks were these:

> Claim 1, as amended, distinguishes over Kell in calling for a spatial filter which is comprised of a first grid of parallel spaced lines having the color of a *subtractive primary,* and a second grid *which is relatively angularly superimposed over all of said first grid,* said second grid having parallel spaced lines which are the color of another *subtractive primary....* Claim 1 further distinguishes over Kell in calling for each grid to have the same line density. Every teaching in Kell, both in the specification and in the drawings, ... is that the line density is different for each grid. [Emphasis in original.]

> The reason why Kell makes his line density different for each grid is that that is the way that he generates his two different modulating frequencies. This applicant insures two different modulating frequencies by virtue of placing one grid at an angle to another grid. As a result, the scanning beam, which traverses the line grids in successive parallel lines, is interrupted at two different frequencies by the two angularly disposed lines of the two grids.

At the April 13, 1984 conference, the court intensively examined SRI's counsel, focusing on and reading aloud the second of the two paragraphs above quoted. Continuing, the court said:

> Do you accept that statement?

> MR. GREGG: That's correct.

> THE COURT: And that's the essence of the '633 patent, is it not?

> MR. GREGG: That's part of the essence, bearing in mind what the statute ... 35 U.S.C. § 103, has to say, ... that you must look at the invention as a whole. And in connection with claim one, it is the filter; in connection with claim seven, for example, it is the entire camera, with the filter in it.

The district court in its Memorandum Opinion quoted the middle sentence of the paragraph it read aloud: "[T]his applicant insures two different modulating frequencies by virtue of placing one grid at an angle to another grid," and held that the claims must therefore be interpreted as limited to composite filters with angled stripes that themselves generate "two different modulating frequencies" when scanned in one pass. 591 F.Supp. at 470, 224 USPQ at 75. Because it found that MEI's angled stripes themselves generate the same modulating frequency in one pass, the court thought there could be no infringement of the structural claims in suit.

Unlike the patentees in *Prodyne Enterprises, Inc. v. Julie Pomerantz, Inc.,* 743 F.2d 1581, 223 USPQ 477 (Fed.Cir.1984) and *Builders Concrete Inc. v. Bremerton Concrete Prods. Co.,* 757 F.2d 255, 225 USPQ 240 (Fed.Cir.1985), SRI did not amend a claim to avoid a prior art reference by insertion of a structural limitation. SRI did not rely on incorporation by reference, as did the patentee in *Envirotech Corp. v. Al George, Inc.,* 730 F.2d 753, 760, 221 USPQ 473, 477 (Fed.Cir.1984). Nor, as did the patentee in *SSIH Equipment S.A. v. U.S. Intern. Trade Com'n,* 718 F.2d 365, 376, 218 USPQ 678, 687 (Fed.Cir.1983), did SRI amend a claim to escape prior art by inserting language which could be understood only by reference to the prosecution history. SRI not only did not amend to escape prior art, it did not insert "relatively angularly superimposed" to do so, and at no time did it insert language into either the claims or the specification that would limit the "information" (set forth in claim as produced by its crossed grids) to that consisting of two rather than one frequency.

---

12. The court said SRI "had a lot of difficulty getting the Patent Office [sic] to issue the patent." The patent issued after two Office Actions and an interview. Some claims, including asserted claims 9 and 10, were allowed after one Office Action.

Nor did SRI insert in any claim any limitation to a particular manner of operation of its claimed structure. Nor in its Remarks did it distinguish Kell on the basis of Kell generating only one frequency in his single scan pass. On the contrary, SRI expressly recognized in the above-quoted Remarks that Kell generated two ("that is the way he generates his two different modulating frequencies").

Nowhere in the prosecution history is there any discussion of a composite filter that generates one modulating frequency. As the first above-quoted paragraph indicates, SRI recognized that Kell angularly superimposed parts of striped grids and that Kell got two frequencies in a single pass, but pointed out that Kell did so with *partially* superimposed grids of *different* line density. SRI could not have properly relied for patentability over Kell on *admittedly old* features.

The claims being structural, the quoted Remarks distinguished them over Kell, as those Remarks were required to do, on the basis of *structure*, i.e., grids angularly superimposed in part (Kell) vs. grids angularly superimposed in their entireties (SRI) and different line densities (stripe widths) (Kell) vs. same line densities (SRI). The claims were necessarily allowed on the basis of those structural differences. SRI's Remarks cannot be read, therefore, as strictly limiting (actually rewriting) the claims as though they were drawn to a method of operation in which angled

stripes themselves generate two frequencies. *Cf. Hughes Aircraft Co. v. United States,* 717 F.2d 1351, 1361, 219 USPQ 473, 480 (Fed.Cir.1983). SRI's explanation that Kell and SRI used different structures to get two frequencies illustrated the *claimed structural distinction* between partial vs. entire superimposition and different vs. same stripe widths; it did not convert the claims in suit to method claims.

In determining that SRI had "argued to the Patent Office a narrow construction of the claims," and was "precluded from arguing a broader construction for purposes of infringement," 591 F.Supp. at 470, 224 USPQ at 75, the district court misconstrued the nature and effect of the prosecution history. Nothing appearing in that history in relation to Kell required a "narrow construction" limiting the structural claims in suit to a method of operation.[13] It was therefore not necessary for SRI to argue "a broader construction" to prove infringement.

We review the district court's construction of the claims in light of the prosecution history as a question of law and we hold it to have been in error.

### (ii) The Specification

The district court also focused on the specification, saying, 591 F.Supp. at 470, 224 USPQ at 74:

13. We do not say, of course, that when an applicant distinguishes prior art and obtains allowance of a structural claim on the basis of the manner in which the claimed structure operates, he may not thereby have so limited his claim. When that happens, the examiner will normally require insertion of limitations to the argued operation. Nor do we say here that claim 1 may not be limited by prior art not before us on this appeal. Nor do we say that the claims must be interpreted to cover all products that literally infringe, no matter how *far* those products may be changed in principle to operate in a *substantially* different way from the way in which the claimed invention operates. We hold only that the single sentence on which the district court focused did not, in view of the structural distinctions argued and claimed, form the basis for allowance of claim 1. Be-

cause it was not relied on for patentability, as was the insertion in *Builders Concrete, Inc. v. Bremerton Concrete Products Co.,* 757 F.2d 255, 225 USPQ 240 (Fed.Cir.1985), that sentence did not constitute a prosecution history estoppel. A sentence pointing out how SRI's different structure can be operated to achieve the same result as Kell did not limit the claim solely to structures operated as the Figure 1 embodiment of the claimed invention is operated. MEI does not, of course, claim to employ Kell's structure or anything similar thereto.

Further, our present holding is limited to the present record and the grant of summary judgment. It does not foreclose the introduction by the parties at trial of any evidence, including that reflected in the prosecution history, on which the fact question raised by the reverse doctrine of equivalents, *infra,* may be resolved.

The specifications of the '633 patent make clear that the claims allegedly infringed envision a filter with grids superimposed at different angles from the vertical to generate frequency variations for the two primary color signals. Quoting the specification's description of a composite filter structure comprised of two grids having lines at "relative angles such that ... an adequate separation is obtained between carrier sidebands derived from said scanning," the district court said "the specifications assume one of the two grids to be oriented vertically with the other diagonally imposed on it to form a 45° angle." *Id.* at 470, 224 USPQ at 74. The district court correctly described the specification, but the difficulty is this: claims are infringed, not specifications.

 When claim construction is required, claims are construable, as above indicated, in light of the specification, *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572, 148 USPQ 479, 482 (1966), yet "[t]hat claims are interpreted in light of the specification does not mean that everything expressed in the specification must be read into all the claims." *Raytheon Co. v. Roper Corp.*, 724 F.2d at 957, 220 USPQ at 597. If everything in the specification were required to be read into the claims, or if structural claims were to be limited to devices operated precisely as a specification-described embodiment is operated, there would be no need for claims. Nor could an applicant, regardless of the prior art, claim more broadly than that embodiment. Nor would a basis remain for the statutory necessity that an applicant conclude his specification with "claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. It is the *claims* that measure the invention. *Aro Mfg. Co., Inc. v. Convertible Top Replacement Co., Inc.*, 365 U.S. 336, 339, 81 S.Ct. 599, 600–01, 5 L.Ed.2d 592, 128 USPQ 354, 356–57 (1961); *Bandag, Inc. v. Al Bolser's Tire Stores, Inc.*, 750 F.2d 903, 922, 223 USPQ 982, 996 (Fed.Cir.1984); *Jones v. Hardy*, 727 F.2d 1524, 1528, 220 USPQ 1021, 1022 (Fed.Cir.1984).[14] Here the claims, which must be read as a whole, set forth structures distinguished from the prior art and were allowed on the basis of structural differences (e.g., claim 1's limitation to superimposition of entire grids, each having equi-width stripes).

 Infringement, literal or by equivalence, is determined by comparing an accused product not with a preferred embodiment described in the specification, or with a commercialized embodiment of the patentee, but with the properly and previously construed claims in suit. *See ACS Hospital Systems, Inc. v. Montefiore Hospital*, 732 F.2d 1572, 1578, 221 USPQ 929, 933 (Fed.Cir.1984); *Teledyne McCormick Selph v. United States*, 558 F.2d 1000, 1007, 195 USPQ 261, 267 (Ct.Cl.1977).

 The law does not require the impossible. Hence, it does not require that an applicant describe in his specification every conceivable and possible future embodiment of his invention. The law recognizes that patent specifications are written for those *skilled in the art*, and requires only that the inventor describe the "best mode" known at the time to him of making and using the invention. 35 U.S.C. § 112.[15]

14. The district court said, "[r]ead alongside the specifications, then, the allegedly infringed claims plainly teach a filter which positions red and blue signals at different carrier frequencies so that they can be decoded by electrical band-pass filters." 591 F.Supp. at 470, 224 USPQ at 74. Specifications teach. Claims claim. There is nothing in the asserted claims themselves about frequencies or band-pass filters. Claim 1, for example, is drawn to a filter affording a recording from which, upon scanning, "information" for reproducing an image may be derived. That a specification describes only one embodiment does not require that each claim be limited to that one embodiment.

15. Whether SRI was *entitled* to a claim of the breadth of claim 1, for example, depends on what appears in the prior art as a whole, not on whether one or more embodiments appear in the specification. Entitlement is a question of patentability, and, as above indicated, is not before us. That the claims in suit are supported by the specification's disclosure has not been here challenged.

As the Supreme Court said in *Smith v. Snow*, 294 U.S. 1, 11, 55 S.Ct. 279, 283, 79 L.Ed. 721, 24 USPQ 26, 30 (1935):

We may take it that, as the statute requires, the specifications just detailed show a way of using the inventor's method and that he conceived that particular way described was the best one. But he is not confined to that particular mode of use since the claims of the patent, not its specifications, measure the invention. *Paper Bag Patent Case*, 210 U.S. 405, 419 [28 S.Ct. 748, 751, 52 L.Ed. 1122]; *McCarty v. Lehigh Valley R. Co.*, 160 U.S. 110, 116 [16 S.Ct. 240, 242–43, 40 L.Ed. 358]; *Winans v. Denmead*, 15 How. 330, 343 [56 U.S. 330, 14 L.Ed. 717]. While the claims of a patent may incorporate the specifications or drawings by reference, see *Snow v. Lakeshore R. Co.*, 121 U.S. 617, 630 [7 S.Ct. 1343, 1351, 30 L.Ed. 1004] and thus limit the patent to the form described in the specification, it is not necessary to embrace in the claims or describe in the specifications all possible forms in which the claimed principle may be reduced to practice.

As one of our predecessor courts stated in *Autogiro Co. of America v. United States*, 384 F.2d 391, 398, 181 Ct.Cl. 55, 64, 155 USPQ 697, 703 (1967):

The specification "set[s] forth the best mode contemplated by the inventor of carrying out his invention." 35 U.S.C. § 112. This one embodiment of the invention does not restrict the claims. Claim interpretation must not make use of "best mode" terms inasmuch as the patentee need not guard against infringement by listing every possible infringing device in the specification. *Adams v. United States*, 330 F.2d 622, 165, Ct.Cl. 576 (1964), *aff'd* 383 U.S. 39 [citations omitted] (1966) ...

The specification language on which the district court focused was excerpted from that describing and explaining the operation of the structure shown in Figure 1, the embodiment employing a set of vertical grid stripes and a second set of grid stripes disposed at a relative angle to the vertical of 45°. The specification, however, expressly states that Figure 1 "by way of example" shows a version of the claimed invention in which a filter has vertical stripes and stripes angled at 45° to the vertical.

The language of no asserted claim requires that any stripes be vertical. Claim 2 is expressly more narrow than claim 1 in that it specifies "45° " as the *relative* angle between the stripes of the two grids.[16] Non-asserted claim 3, *supra*, however, does contain a limitation requiring that one set of grid stripes be "vertical".

■ The district court thus read, via the specification, the "45°" limitation of narrower claim 2, and the "vertical" limitation of narrower claim 3, into broader claim 1 and the other asserted claims. It is settled law that when a patent claim does not contain a certain limitation and another claim does, that limitation cannot be read into the former claim in determining either validity or infringement. *Fromson, supra*, 720 F.2d at 1570, 219 USPQ at 1141; *Environmental Designs, Ltd. v. Union Oil Co. of California*, 713 F.2d 693, 699, 218 USPQ 865, 871 (Fed.Cir.1983); *Palumbo v. Don-Joy Co.*, 762 F.2d at 977, 226 USPQ at 10.

The reason for the rule is well illustrated here. Non-asserted claim 3 is specifically drawn to the structure of Figure 1. To interpret the asserted claims as though they were *also* drawn to that structure (or to its manner of operation) would be to render the asserted claims superfluous.

In interpreting the asserted claims in light of the specification, the district court read limitations into them from other claims. That was error as a matter of law.

### (4) The Reverse Doctrine of Equivalents

As counsel for SRI told the court, the "principal issue" of fact was whether

---

**16.** If, as SRI contends, MEI's stripes are each at 22½° to the vertical, (i.e., that MEI merely "tilted" the grids of Figure 1) their relative angle would be 45°. MEI tells us it does not rely on the absence of vertical stripes from its filter as an indication of non-infringement.

MEI's filter is "so different in principle that it's an altogether different invention," an apparent attempt to paraphrase the judicially stated reverse doctrine of equivalents.[17] As a basis for its grant of summary judgment, the district court found noninfringement under that doctrine. Because in this case there is a genuine issue of material fact respecting whether MEI's filter and camera structure is so far changed in principle that it performs the same or a similar function in a substantially different way, a trial of that issue is required.

Availability of the reverse doctrine of equivalents was set forth by the Supreme Court in *Graver Tank & Mfg. Co., Inc. v. Linde Air Prods. Co., Inc.,* 339 U.S. 605, 608–09, 70 S.Ct. 854, 856–57, 94 L.Ed. 1097, 85 USPQ 328, 330 (1950):

> The wholesome realism of [the doctrine of equivalents] is not always applied in favor of a patentee but is sometimes used against him. Thus, where a device is so far changed in principle from a patented article that it performs the same or a similar function in a substantially different way, but nevertheless falls within the literal words of the claim, the doctrine of equivalents may be used [in reverse] to restrict the claim and defeat the patentee's action for infringement.[18]

As made clear in *Graver Tank,* in which the Court upheld a finding of infringement under the doctrine of equivalents as "supported by the record" and "not clearly erroneous", the ultimate finding of infringement, or "actual infringement," may depend on facts and circumstances unique to the case.

■ Infringement is defined in 35 U.S.C. § 271(a) as the unlicensed making, using, or selling of a patentee's claimed invention. Recognizing frailties of language and limitations on human foresight, the law acknowledges that one may appropriate another's patented contribution not only with a product precisely described in a patent claim (literal infringement) but also with a product that is not quite so described but is in *fact* "substantially the same thing, used in *substantially* the *same* way, to achieve substantially the same result" (doctrine of equivalents). The law also acknowledges that one may only appear to have appropriated the patented contribution, when a product precisely described in a patent claim is in *fact* "so *far* changed in principle" that it performs in a *"substantially different* way" and is not therefore an appropriation (reverse doctrine of equivalents). One who takes a claimed structure and merely uses it in a way that differs from that in which a specification-described embodiment uses it, does not thereby escape infringment. *Smith v. Snow, supra.*

■ The patentee bears the burden of proving infringement by a preponderance of the evidence. *Envirotech Corp. v. Al George, Inc.,* 732 F.2d 1572, 221 USPQ 929 (Fed.Cir.1984); *SSIH Equipment S.A. v. United States International Trade Commission,* 718 F.2d 365, 218 USPQ 678 (Fed.Cir.1983). Initially that burden is carried when literal infringement has been proved.[19] *See Graver Tank,* 339 U.S. at 607, 70 S.Ct. at 855–56, 85 USPQ at 330. When a patentee establishes literal in-

---

17. At various points, SRI's counsel was, however, unhelpful to the district court. Under extended questioning by the court, counsel responded affirmatively to a question of whether the specification of the '633 patent contained material describing MEI's filter operation, leading the court to state a nonexistent requirement, "I don't think anywhere in the '633 patent do you find a picture of filters that are identical to the MEI."

18. Surprisingly, neither party cited *Graver Tank, supra,* on appeal. The case sets the classical considerations governing determination of

literal infringement, infringement under the doctrine of equivalents, and noninfringement under the reverse doctrine of equivalents. *See also Westinghouse v. Boyden Power Brake Co.,* 170 U.S. 537, 568, 18 S.Ct. 707, 722, 42 L.Ed. 1136 (1898).

19. Because products on which patent claims are readable word for word often are in fact the same, perform the same function in the same way, and achieve the same result, as the claimed invention, a defense based on the reverse doctrine of equivalents is rarely offered.

fringement, the accused infringer may undertake the burden of going forward to establish the fact of non-infringement under the reverse doctrine of equivalents. If the accused infringer makes a *prima facie* case, the patentee, who retains the burden of persuasion on infringement, must rebut that *prima facie* case.

■ The doctrine of equivalents raises a fact question determinable upon inquiry into whether a product is substantially the same thing used substantially the same way to achieve substantially the same result. *Graver Tank*, 339 U.S. at 609, 70 S.Ct. at 856–57, 85 USPQ at 330 ("A finding of equivalence is a determination of fact."). *See also Autogiro Co. v. United States*, 384 F.2d 391, 181 Ct.Cl. 55, 155 USPQ 697 (1967). As above indicated, the reverse doctrine of equivalents also raises a fact question, determinable on inquiry into whether a product has been so far changed in principle that it performs the same or similar function in a substantially different way. Though the second inquiry differs (literal infringement being present) it is nonetheless directed to a fact issue.

■ The district court here addressed the *factual* inquiries listed in *Autogiro*, but said it was doing so "as a matter of law" because, as it construed the claims in suit, the "gist of the ... patent is the creation of two carrier frequencies to encode color information." But a court's election to ignore the structural claims, and to substitute a "gist" drawn from the operation of a disclosed embodiment, cannot convert the fact question raised by the reverse doctrine of equivalents into a legal question of claim construction. That fact question is simple and direct: Is the accused product so far changed in principle that it performs the function of the claimed invention in a substantially different way?

There is no question, as the district court found and as SRI from the outset admitted, that MEI's filter and camera are so operated as to perform their functions in a way that differs from the way in which the structure of SRI's Figure 1 performs those functions. SRI and MEI had the right, however, to adduce documentary and testimonial evidence at trial in an effort to convince the fact finder that the MEI filter is or is not "so *far* changed in principle" that it performs "in a *substantially* different way."

The test mandated in *Graver Tank* leaves room for the fact finder's application to varying circumstances. Words like "so far", "principle" and "substantially" are not subject to rigid pre-definition; nor will the "principle" of a structural invention be always and immediately apparent. It is precisely the role of a trial to apply the test in light of all the live testimony and physical evidence adduced.

At trial, SRI and MEI can cross-examine each other's witnesses on their narrative statements, and may sustain all or some of their objections filed pursuant to the October 19, 1983 order. (Those objections asserted conflict with witnesses' other statements and writings.) The SRI and MEI filters and cameras may be demonstrated. The principle of the claimed invention, and that of MEI's product, and the degree of change, if any, in the latter, may be determined in light of all the evidence, as may the question of whether the latter performs in a substantially different way. In sum, the key infringement question, i.e., whether a principle has been so *far* changed that the way is *substantially* different, depends on the evidence.

The Supreme Court supplied guidance useful here in *Graver Tank*, 339 U.S. at 609, 70 S.Ct. at 856–57, 85 USPQ at 330 (e.g., equivalence is not the prisoner of a formula, nor an absolute to be considered in a vacuum; it does not require identity in every purpose and respect; it is determined against the context of the patent, the prior art, and particular circumstances of the case; one factor is whether the accused product resulted from independent research; an important factor is whether persons reasonably skilled in the art would have known of the interchangeability of an ingredient not contained in the patent with one that was). A major factual dispute in this case, for example, is whether the par-

ties employ substantially different ways of encoding color (MEI's position) or readily interchangeable ways long known to those skilled in the art for whom patents are written (SRI's position). *See Thomas & Betts Corp. v. Litton Systems, Inc.*, 720 F.2d 1572, 1580, 220 USPQ 1, 6 (Fed.Cir. 1983) (known interchangeability of elements is evidence of equivalence).

### (5) Reason for In Banc Action

MEI relies on one phrase in a single case,[20] *Kalman v. Kimberly-Clark Corp.*, 713 F.2d 760, 218 USPQ 781 (Fed.Cir.1983), for the proposition that non-infringement under the reverse doctrine of equivalents is a legal question. In *Kalman*, this court determined that the district court's *fact finding* of identity of invention (reached after a four day bench trial) was not clearly erroneous, and that "the stipulation by the parties, coupled with [Kimberly Clark's] failure to counter Kalman's affidavits and evidence submitted in his motion for summary judgment" dictated a finding of infringement. On that undisputed record, this court affirmed the judgment based on that finding. In response to an argument of appellant, the question of the reverse doctrine of equivalents—in a case involving that particular record of stipulation and unchallenged affidavits—was termed "a legal question". *Id.* at 771, 218 USPQ at 788.

Because the statement respecting the reverse doctrine of equivalents, i.e., that it raises a legal question, may be considered a holding to that effect, the court has *sua sponte* taken this case under consideration *in banc*. *See South Corp. v. United States*, 690 F.2d 1368, 1370 n. 2, 215 USPQ 657, 658 n. 2 (Fed.Cir.1982). To the extent that the statement constituted a holding in *Kalman*, it must be and is hereby overruled.[21]

■ It is settled that the question of infringement (literal or by equivalents) is factual. *Graver Tank, supra*. It would be anomalous to hold that the question of noninfringement (literal or by the reverse doctrine of equivalents) is not factual. Equivalence and non-equivalence, as the terms indicate, are but opposite sides of the same coin. In determining each, a court must say whether an accused device operates in substantially the same way (equivalence) or in a substantially different way (non-equivalence). The doctrine of equivalents may be employed, as was said in Graver, to expand or *restrict* a claim.[22]

Indeed, the Supreme Court in *Graver Tank, supra*, and one of our predecessor courts in *Decca Limited v. United States*, 420 F.2d 1010, 1014, 190 Ct.Cl. 454, 459–463, 164 USPQ 348, 351, *cert. denied*, 400 U.S. 865, 91 S.Ct. 102, 27 L.Ed.2d 104 (1970), said "the *doctrine of equivalents* may be used to restrict the claim," (emphasis added), and this court in *Kalman*, 713 F.2d at 771, in rejecting appellant's argument on the reverse doctrine of equivalents, employed the classic statement of equivalence, saying: "the Berlyn devices do the same work, in substantially the same way, to accomplish substantially the same result."

The question of non-infringement under the reverse doctrine of equivalents, as above indicated, raises in this case a genuine issue of material fact which renders the issued summary judgment inappropriate. *See Martin v. Barber*, 755 F.2d 1564, 225 USPQ 233 (Fed.Cir.1985).

**20.** We have found no case indicating that the fact question of infringement or non-infringement becomes "a legal question" when the determination rests on a disputed application of the reverse doctrine of equivalents.

**21.** As indicated in the text, counsel cited the statement in *Kalman* to the district court. Though the statement does not appear in the district court's Memorandum Opinion, it could have contributed to its grant of summary judgment. To the extent the district court may have been misled, this court regrets the necessity of correcting the statement appearing in *Kalman*.

**22.** In both instances, one is dealing with whether a particular product falls within a *range* of products which the patent entitles the patentee to exclude others from making, using, or selling.

### (6) Conclusion

The genuine and material fact question of whether MEI's filter and camera are "so far changed in principle" that they "perform the same or a similar function in a substantially different way" being present and disputed, the district court erred in granting summary judgment.[23]

REVERSED.

MARKEY, Chief Judge, with whom PAULINE NEWMAN, Circuit Judge, joins, additional views.

The court, sitting *in banc*, has declined to decide whether the denial of the jury demand was improper in this case, considering that step unnecessary and adhering to the rule that courts should not, unless compelled, decide constitutional questions.

Because of this court's mandate to contribute to uniform guidance in the national law of patents (as well as in that governing federal personnel, government contracts, international trade, and claims against the government), and because of what is seen as the mistaken belief by some members of the bar and some district courts, including the district court in this case, that this court has created or is creating a dichotomy between the rules governing the right to jury trials in patent suits for damages and the rules governing the right to jury trials in other suits for damages, these additional views are offered.

The district court here abandoned the initial pretrial preparation for jury trial, converting it into preparation for a bench trial. In denying the presence of a "factual issue that would be proper for a jury" the district court, as above quoted, responded to the metaphorical reference by SRI's counsel to MEI's position that operation of the embodiment shown in Figure 1 and MEI's "technique" were as different as apples and oranges:

> That doesn't strike me as a jury issue. That strikes me as an issue that is appropriate for a judge to decide, *particularly* if oranges are rather obscure things *in the common experience of a jury.* [Emphasis added.]

The district court, in deciding at that point to conduct a bench trial in place of the demanded jury trial, referred to unidentified "decisions" of this court (which hears appeals of district court judgments in patent cases) as indicating a dichotomy between factual issues appropriate for a jury and factual issues appropriate for a judge:

> It seems to me, under the particular recent decisions under [sic] the Federal Circuit, it's a pure question of deriving ultimate facts from undisputed evidence, which is properly done by the judge.
>
> Mr. Gregg, I have read your papers carefully, but I don't see any *factual issues that would be proper for a jury.* [Emphasis added.][1]

At another point, the court appeared to specifically distinguish demands for jury trials in patent cases from those in other types of cases:

> Of course, Mr. Gregg, the two sides will present different evidence, but that doesn't mean there is any conflict in the evidence. And in the absence of an evidentiary conflict, I don't see a jury issue *in a patent case.* [Emphasis added.]

To the extent that the district court's denial of the jury trial demand and decision to proceed with a bench trial (two months before the court's indication of intent to consider summary judgment) rested on an understanding that this court's decisions have distinguished between considerations governing the right to a jury trial in patent infringement cases for damages and the right to a jury trial in other types of cases,

---

23. A genuine issue of material fact being present, a trial on that issue is required. Presumably, jury trial was here denied on the premise that no such issue was present. If SRI renews its request for jury trial, the district court will consider that request in light of the foregoing opinion.

1. The court was not here dealing with the decisional rules governing motions for summary judgment, or for directed verdict, or for JNOV, but with the sole question of whether the "liability phase" of the case would be *tried* before a jury or before the judge, as its order, *supra,* stated.

it is appropriate to affirm unequivocally that patent litigants are entitled to neither a greater nor a lesser but to the same right to a jury trial, under the same governing considerations, as are all other litigants.[2]

### (a) Complexity

Those who would create a basis for distinguishing the right to jury trial of patent litigants from the same right of other litigants point to the "complexity" present in some patent cases.

Despite the clear directive of the Seventh Amendment—that "the right to jury trial *shall be preserved* " (emphasis added)—one federal appellate court and three federal district courts have remanded or struck jury demands in "complex" civil cases, relying on a judge-created "complexity exception". *See In re Japanese Elec. Prods. Antitrust Litigation*, 631 F.2d 1069 (3d Cir.1980); *Bernstein v. Universal Pictures, Inc.*, 79 F.R.D. 59 (S.D.N.Y.1978); *ILC Peripherals Leasing Corp. v. IBM Corp.*, 458 F.Supp. 423 (N.D.Ca.1978), *aff'd on other grounds sub nom. Memorex Corp. v. IBM Corp.*, 636 F.2d 1188 (9th Cir.1980); *In re Boise Cascade Securities Litigation*, 420 F.Supp. 99 (W.D.Wash. 1976). One court has noted in passing the possible availability of that exception. *See Davis-Watkins Co. v. Service Merchandise Co., Inc.*, 500 F.Supp. 1244 (M.D.Tenn. 1980), *aff'd*, 686 F.2d 1190 (6th Cir.1982).

Proponents of a "complexity exception" say legally or factually complex matters, e.g., those appearing in *some* antitrust, securities, or patent cases, are "too complex" for juries to comprehend, and those cases should therefore be tried by a single judge.[3] One line of argument looks to the distinction made in England in 1791 between "suits at common law" and "proceedings at equity".[4] Professor Arnold's research would undermine the acceptance of the historical basis for that position. *See* Arnold, *A Historical Inquiry Into The Right To Trial By Jury in Complex Civil Litigation*, 1 28 U.Pa.L.Rev. 829 (1980). Arnold was promptly challenged. *See* Campbell and Le Poidevin, *Complex Cases and Jury Trials: A Reply to Professor Arnold*, 128 U.Pa.L.Rev. 965 (1980); *see also ILC Peripherals, supra,* 458 F.Supp. at 447; Devlin, *Jury Trial of Complex Cases: English Practice at the Time of the Seventh Amendment*, 80 Colum.L.Rev. 43 (1980); Note, *Complex Civil Litigation and the Seventh Amendment Right to a Jury Trial*, 51 U.Chi.L.Rev. 581 (1984). It is argued, nonetheless, that the Seventh Amendment right to jury trial, placed in our Constitution in 1791, was never "intended" to extend to certain "complex cases" of today.[5]

A second line of argument for a "complexity exception" is that trying a complex

---

**2.** SRI's brief on appeal argues that it was wrongly denied its demand for a jury trial on the infringement issue. MEI's brief on appeal responded with a single footnote referring to the non-present validity issue and saying the grant of summary judgment indicates absence of need for jury trial.

**3.** We have found no suggestion that persons charged with crime should be denied their Sixth Amendment right to a jury trial, though some criminal trials involve highly complex matters of law and fact. It appears at least incongruous to suggest that a person may with due process be deprived of life or liberty following a complex criminal trial by jury, but cannot with due process be deprived of a property interest following a complex civil trial by jury.

Nor has anyone yet spelled out definitive, reliable criteria on which to determine clear boundaries for "simple", "complex but not too complex", and "too complex".

**4.** A patentee seeking only an injunction is not entitled to trial by jury. 5 MOORE'S 38.24[1].

**5.** The same argument could be applied to many segments of the Constitution. Moreover, it is irrelevant whether a case involving 1985 complexities could be well decided by a 1791 jury. Judges in 1791 were among the very few who were educated. The Seventh Amendment brings the people into our jurisprudential system. In almost 200 years, while society grew more complex, the education and work experience of the people advanced as well. It is clear that juries will necessarily differ in "competence," but it is at best incongruous to suggest that a society that sends its citizens routinely into space could never produce a jury competent to determine a case some judge might consider too "complex" for people with "common experience" to decide. *See infra,* note 25.

case before an "incompetent" jury denies the due process protection of the Fifth and Fourteenth Amendments. *See In re Japanese Electric Prods. Antitrust Litigation, supra,* 631 F.2d at 1086; *see also* Oakes, *The Right to Strike the Jury Trial Demand in Complex Litigation,* 34 U.Miami L.Rev. 243, 289 (1980); Note, *The Right To An Incompetent Jury: Protracted Civil Litigation and the Seventh Amendment,* 10 Conn.L.Rev. 775 (1978). Proponents of that view argue that a jury "incapable" of understanding the evidence, or the legal rules to be applied, provides no "constitutional" safeguard against an "erroneous" result. The argument confuses the route with the destination, for "due process" is just that, a process. It is an important and constitutionally required process. It is not a result.[6]

One commentator, apparently recognizing that not all judges are inevitably more competent than all juries, has suggested that the "complexity exception" should encompass judges. *See* 5 J. MOORE'S FEDERAL PRACTICE ¶ 38.02[1] (1984).[7] Empirical support is simply lacking for the assumption that the process provided in a properly conducted jury trial is necessarily less "due" than that provided in a bench trial.

However some may view what they see as a "better system", and however one may weigh its effect on the due process clauses of the Fifth and Fourteenth Amendments, judges are nowhere authorized to exercise their personal predilection by revising or repealing the Seventh Amendment.[8] The arguments supporting denial of a jury demand in complex civil cases are clearly submissible to the Congress or to the States in support of a proposal under Article V of the Constitution; they are not appropriately submissible to judges sworn

6. The requirement is that trials be fair, not perfect. As discussed in the text, numerous safeguards exist against a clearly "erroneous result" following a jury trial. Much of the support for a complexity exception appears bottomed on an assumption that time and cost might be saved if all the trappings of the jury system (jury wheels, scheduling, impanelling, excuses from duty, risk of "hung" juries, interference with juror's lives in a long trial, etc.) were eliminated in at least some civil cases. *See* POSNER, THE FEDERAL COURTS; CRISIS AND REFORM 130 n. 1 (1985). That assumption may be contrasted with one of the reasons for re-emergence of demands for jury trials in patent cases, i.e., that a verdict may be obtained in hours, whereas obtaining a court decision after a bench trial of a patent case has often required years.

That juries have been eliminated from most civil litigation in Great Britain is of little if any relevance to the present discussion. The training and recruitment of judges in that country differs substantially from our own, and there is no Seventh Amendment requirement that the right to jury trial be preserved.

7. The press reports that the jury impanelled to determine damages, in a case involving extremely complex economic factors and the largest potential award in history, includes an engineer, a hearing system designer, an accountant, a purchasing agent, an aircraft mechanic, a chemist, a bank loan officer, a secretary, a housewife, a clerk, and a college employee.

"Telephone Titans Resume Battle in Antitrust Case; MCI Pitted Against AT & T in Law Suit Seeking Record Award for Damages", *The Washington Post,* D1, D24, April 14, 1985. It is at least doubtful that the experiential background of any judge could match that of this particular jury. "Jurors, if properly instructed and treated with deserved respect, bring collective intelligence, wisdom, and dedication to their tasks, which is rarely equalled in other areas of public service.... We do not accept [the view] 'that a single judge is brighter than the jurors, collectively functioning together.'" *In re U.S. Financial Sec. Litigation,* 609 F.2d 411, 430 (9th Cir.1979), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980). *See also Zenith Radio Corporation v. Matsushita Elec. Indus. Co.,* 478 F.Supp. 889, 935 (E.D.Pa.1979), *vacated sub nom. In re Japanese Elec. Prods. Antitrust Litigation, supra;* Higginbothom, *Continuing the Dialogue; Civil Juries and the Allocation of Judicial Power,* 56 Tex.L.Rev. 47, 53 (1977).

8. Little can be added to Judge Gilmore's statement in the patent related case of *Kian v. Mirro Aluminum Co.,* 88 F.R.D. 351, 355, 209 USPQ 272, 275 (E.D.Mich.1980):

Those who wold seek an "elitest" approach to the use of the jury trial would undermine one of the most fundamental of our rights. There is no complexity exception to a jury trial that would authorize the denial of a jury when it is otherwise available under the Seventh Amendment.

to uphold that Constitution. To permit a judicial interpretation of a constitutional provision that destroys another constitutional provision is to place at risk the entire Constitution. *See Ullman v. United States*, 350 U.S. 422, 428–29, 76 S.Ct. 497, 501–02, 100 L.Ed. 511 (1956).

The call for injection of "expertise" into our jurisprudence can be as alluring, and as fatal, as the sirens' song. Exhibiting no desire to convert our jurisprudence into "juriscience", Congress has repeatedly rejected calls for "specialized" courts limited to decision making solely on technological considerations, *see Atari, Inc. v. JS & A Group, Inc.*, 747 F.2d 1422, 1436, 223 USPQ 1074, 1084 (Fed.Cir.1984), and has cautiously limited reliance on "expertise" to its employment by administrative agencies.[9]

Those few courts that have referred to a "complexity exception" have pointed to dicta in *Ross v. Bernhard*, 396 U.S. 531, 90 S.Ct. 733, 24 L.Ed.2d 729 (1970). After holding that the Seventh Amendment *did* guarantee a right to jury trial in a stockbroker's derivative action, the Court stated that "[t]he Seventh Amendment question depends on the nature of the issue to be tried rather than the character of the overall action." 396 U.S. at 538, 90 S.Ct. at 738, adding this footnote:

> As our cases indicate, the "legal" nature of an issue is determined by considering, first, the pre-merger custom with reference to such questions; second, the remedy sought; and, third, the practical abilities and limitations of juries. Of

these factors, the first, requiring extensive and possibly abstruse historical inquiry, is obviously the most difficult to apply. See James, Right to Jury Trial in Civil Actions, 72 Yale L.J. 655 (1963). *Id.* at 538 n. 10, 90 S.Ct. at 738 n. 10.[10]

A footnote to the dissent stated:

> ... Certainly there is no consensus among commentators on the desirability of jury trials in civil actions generally. Particularly where the issues in the case are complex ... much can be said for allowing the court discretion to try the case itself.

*Id.* at 545 n. 5, 90 S.Ct. at 741–42 n. 5.[11]

Though the Third Circuit majority in *Japanese Electronic Products, supra,* rejected contentions that "extraordinary complexity renders a suit equitable in nature," 631 F.2d at 1081, and that complexity warranted discretionary exercise of equitable jurisdiction, *id.* at 1083, it remanded for a determination of whether a balancing of Fifth and Seventh Amendment interests showed that "a jury will not be able to perform its task of rational decisionmaking with a reasonable understanding of the evidence and the relevant legal standards." *Id.* at 1086. The court then promptly cautioned:

> We do not believe that a due process limitation allows the district courts a substantial amount of discretion to deny jury trials. Because preservation of the right to jury trial remains a constitutionally protected interest, denials of jury trial on grounds of complexity should be con-

---

9. Where patent validity is at issue, a highly specialized, expert, and disinterested determination of patentability may be obtained in reexamination proceedings before the Patent and Trademark Office. *See In re Etter*, 756 F.2d 852, 225 USPQ 1 (Fed.Cir.), *cert. denied,* —— U.S. ——, 106 S.Ct. 88, 88 L.Ed.2d 72 (1985). The decision on reexamination is subject to judicial review. 35 U.S.C. §§ 141–145.

10. Professor Wright was "surprised" by the reference to "the practical abilities and limitations of juries":
 ... The third of the factors mentioned in that footnote was surprising since it seems to invite a balancing approach to the right to jury trial, while the accepted learning has been

that that balance was already struck by the Seventh Amendment. But "the footnote is so cursory, conclusory, and devoid of cited authority or reasoned analysis that it is difficult to believe it could have been intended to reject such historical practice or Supreme Court precedent."
WRIGHT, LAW OF FEDERAL COURTS § 92, at 614 (4th ed. 1983).

11. The Court's series of decisions since 1970 approving juries of less than 12 and verdicts by majority vote have been severely criticized. *See, e.g.,* HASTIE, PENROD & PENNINGTON, INSIDE THE JURY (1983).

fined to suits in which due process clearly required a nonjury trial. This implies a high standard. It is not enough that trial to the court would be preferable. The complexity of a suit must be so great that it renders the suit beyond the ability of a jury to decide by rational means with a reasonable understanding of the evidence and applicable legal rules.[12]

*Id.* at 1088.

The Ninth Circuit, in which sits the district court in this case, has repeatedly rejected calls for a "complexity exception", stating that "we do not believe any case is so overwhelmingly complex that it is beyond the abilities of a jury." *In re U.S. Financial Securities Litigation,* 609 F.2d 411, 432 (9th Cir.1979), *cert. denied,* 446 U.S. 929, 100 S.Ct. 1866, 64 L.Ed.2d 281 (1980); *see also Davis & Cox v. Summa Corp.,* 751 F.2d 1507, 1516 (9th Cir.1985). The Seventh and Fifth Circuits have reserved judgment on the constitutionality of a complexity exception and have declined to apply it. *See, e.g., Soderbeck v. Burnett County, Wisconsin,* 752 F.2d 285, 289 (7th Cir.1985); *Pinemont Bank v. Belk,* 722 F.2d 232, 238 (5th Cir.1984). *No* circuit has affirmed an actual jury denial on the ground of complexity.

We discern no authority and no compelling need to apply in patent infringement suits for damages a "complexity" exception denying litigants their constitutional right under the Seventh Amendment. *See generally* Ropski, *Constitutional and Procedural Aspects Of The Use Of Juries In Patent Litigation,* 58 J.Pat. Off Soc'y 609 (Part I) (1976); Sperlich, *The Case for Preserving Trial by Jury in Complex Civil Litigation,* 65 Judicature 394 (1982); *accord* Pell, *Patent Law Cases—A Retrospective View From A Lame Swan Appellate Judge,* 9 APLA Quarterly J. 105, 112–125 (1981). There is no peculiar cachet which removes "technical" subject matter

from the competency of a jury when competent counsel have carefully marshalled and presented the evidence of that subject matter and a competent judge has supplied carefully prepared instructions.

There is thus no warrant for limiting even complex patent litigation to an exclusive professional ritual engaged in only by lawyers and judges. Elbowing to one side the Seventh Amendment, and the compelling social and democratic (much less constitutional) bases for its existence, would be at best an unseemly judicial exercise.

Jury demands are made before jury selection. The "competency" of the jury that will be selected cannot at that time be reliably measured. Doubtless juries vary in "competence" but, as appears below, denial of a jury demand should not be premised on the notion that the jury will be allowed to function as though it were left twisting in the wind. "[J]udicial management of the complex case tried to a jury is key to the effective disposition of the case." *See* Constantino and Master, *The Seventh Amendment Right To Jury Trial In Complex Civil Litigation: Historical Perspectives And A View From The Bench,* 12 AIPLA Quarterly J. 279, 284 (1984); *Connell v. Sears, Roebuck & Co.,* 722 F.2d 1542, 1547, 220 USPQ 193, 197 (Fed.Cir.1983) ("So long as the Seventh Amendment stands, the right to a jury trial should not be rationed, nor should particular issues in particular types of cases be treated differently from similar issues in other types of cases."). *See also* POSNER, *supra* n. 24, at 219 ("If Congress abolished the right to jury trial in federal civil cases, it would take a very loose construction of the Seventh Amendment to avoid a declaration of unconstitutionality.").

The constitutional right to jury trial should not depend on which judge is assigned; i.e., on whether a particular judge views particular fact issues as "too com-

---

**12.** In *Japanese Electronic Products,* supra, the trial judge had denied a motion to deny jury trial, but certified the question for interlocutory appeal. As of this writing, the trial judge on remand has not found it necessary to conduct a

"balancing of the Fifth and Seventh Amendment interests," or to deprive a party of a "constitutionally protected interest" because the suit was "beyond the ability of a jury" but not beyond his own.

plex" for what the judge assumes will be the jury's "common experience." "One of the principal objections to the draft of the Constitution was its failure to guarantee jury trials ... the colonists jealously guarded the rights and powers of juries, with judges and juries being more or less co-equals in the judicial process." Schwarzer, *Communicating with Juries: Problems and Remedies*, 69 Cal.L.Rev. 731, 734.

In the case at bar, the district court indicated that this court had distinguished between fact issues "appropriate" for a jury and those "appropriate" for a judge. There is, however, no such distinction in the Seventh Amendment. Fact issues are no less such because they are "complex" or "ultimate". The district court, in announcing its decision to deny a jury trial and employ a bench trial, said "these questions" could be resolved in that way "more economically and expeditiously." But whether judicial economy and expedition might be served is irrelevant. The Seventh Amendment contains no "economy" exception.[13]

### (b) Management

For those whose concern for jury competence would deny patent litigants the same right to jury trial available to others, reassurance abounds. To begin, the same governing Rules apply. First, if genuine material fact issues are absent, jury trial may be denied and summary judgment granted as a matter of law. Rule 56, Fed.R.Civ.P. Second, a court may remove a case from the jury on motion for a directed verdict, the facts presented at that point being undisputed by the movant and failing in law to support any possible verdict for the non-mover. Rule 50(a), Fed.R.Civ.P. Third, after the jury has returned its verdict, after the jury has returned its verdict, court may set it aside on motion for JNOV

when, on the totality of the evidence, and after drawing all inferences and credibility determinations in favor of the non-movant, no reasonable jury could have reached that verdict. Rule 50(b), Fed.R.Civ.P. Lastly, judges exercise substantial control over jury trials in choosing to require a general or special verdict, Rule 49(a), Fed.R.Civ.P., in admitting and excluding evidence, in instructing the jury on the law, in choosing to employ interrogatories, Rule 49(b), Fed. R.Civ.P., and in granting new trials, Rule 59, Fed.R.Civ.P. *See generally* Ropski, *Constitutional and Procedural Aspects of the Use of Juries in Patent Litigation* (Part II-Conclusion), 58 J.Pat.Off.Soc'y 673 (1976).

Reassurance resides also in the role of judge and counsel in managing, simplifying, and assuring presentation of complex evidence with clarity to the fact-finder. That effective trial management is the route to fair resolution of "complex" matters in jury trials is a truism unchallenged by extant empirical evidence.

As they have in varying degrees for almost 200 years, trial judges daily require, as did the district court here, pretrial procedures in an effort to identify and focus the issues. They discourage unnecessary pleadings and encourage stipulation of undisputed matters. They precharge the jury and explain legal and technical terms to be used. They shield the jury from irrelevant, non-probative evidence and from unnecessarily lengthy or complicated "foundation" laying. They encourage use of charts, graphs, and other visual devices to focus and clarify the evidence. Following summations, trial judges greatly facilitate the jury's function when they give clear-cut, comprehensible jury instructions in plain

---

13. MEI cites *Structural Rubber Products Co. v. Park Rubber Co.*, 749 F.2d 707, 223 USPQ 1264 (Fed.Cir.1984), saying "the propriety of [the district court's] emphasis on clarifying the issues to be presented to a jury was recently acknowledged by this Court." Clarifying issues is an important and needed function; it is not the same as removing issues. In *Structural Rubber,* the court did not suggest that a basis exists for distinguishing between genuine material fact *issues* for the jury and genuine material fact issues for the judge in considering a party's constitutionally protected right under the Seventh Amendment.

and simple English. *See generally* Schwarzer, *supra.*[14]

And if further reassurance be demanded, it can be found in the availability of the appellate process.

DAVIS, Circuit Judge, concurring in the result.

I believe that (1) application of the reverse doctrine of equivalents presents a factual (not a legal) issue; (2) there is a question whether MEI's device literally infringes the claims in suit; and (3) the reverse doctrine of equivalents and prosecution history estoppel having been raised as a defense to literal infringement, there is sufficient doubt about the relevant facts and circumstances to call for a full trial and to make erroneous the grant of summary judgment below. In a comparable recent case, in which there was similar doubt as to the relevant facts bearing on equivalents, we overturned a summary judgment and directed that a trial be had. *Palumbo v. Don-Joy Co.*, 762 F.2d 969, 973–77, 226 USPQ 5, 7–10 (Fed.Cir.1985). I concur with the majority of the court that we should do the same here, especially since the District Court seems to have treated application of equivalents as essentially a legal issue.

But I do *not* agree that this court should decide on this appeal the issue of prosecution estoppel against appellee as a matter of law. Rather, that question, too, should be remitted for trial, as was done with respect to the prosecution history questions in *Palumbo, supra*, 762 F.2d at 976–77, 226 USPQ at 10, and in *Lemelson v. TRW, Inc.*, 760 F.2d 1254, 225 USPQ 697 (Fed.Cir. 1985). In my view, the meaning and impact in this case of the cited prosecution history is sufficiently uncertain that explanatory testimony and fuller ventilation could well be helpful.

I add explicitly that (a) I believe that the trial court dispensed with a jury trial here for no other reason than that it wrongly concluded that there were no disputed factual issues needing any type of trial, (b) there never has been in this case, and is not now, any question relating to the so-called "complexity exception" to the right to a jury trial, (c) the "complexity exception" issue was neither raised nor briefed nor argued by either side in this case, and (d) it would be wholly gratuitous, unnecessary, and inappropriate to decide that issue in this case.

KASHIWA, Circuit Judge, with whom BALDWIN, BENNETT, NIES, and BISSELL, Circuit Judges, join, dissenting.

I disagree with the lead opinion to reverse the district court's grant of summary judgment of noninfringement. The claims asserted by SRI, interpreted in view of the '633 patent specification, file history and prior art, are not infringed by the MEI device.[1] As a separate and independent

---

**14.** The modern federal judiciary has not been lacking in innovative steps designed not to avoid but to facilitate the constitutional command that "the right to jury trial shall be preserved." Those steps are directed toward improving opportunities for jury understanding. Jurors have been permitted to take notes, *see* Schwarzer, *supra*, 69 Cal.L.Rev. at 757, 758. In a recent libel trial, periodic summations were employed, *see Westmoreland v. CBS, Inc.*, No. 82–C–7913 (S.D.N.Y.1985), and in another the jury separately determined seriatim the separate issues of truth, malice, and injury. *See Sharon v. Time, Inc.*, No. 83–C–4660 (S.D.N.Y.1985). Jurors may be allowed to submit questions through the bench to the parties. *See Report of the Committee on Juries of the Judicial Council of the Second Circuit* (August 1984). The need to consider other possible changes has been made clear.

*See* Burger, *Agenda For Change*, 54 Judicature 232, 235 (1971).

**1.** "Literal correspondence," as the lead opinion coins the term, is quite different from literal infringement under the precedent of this Court. Under our precedent, literal infringement cannot be determined without first determining what a claim means in light of the specification, the prosecution history, and the prior art. *Envirotech Corp. v. Al George, Inc.*, 730 F.2d 753, 760, 221 USPQ 473, 477 (Fed.Cir.1984); *SSIH Equipment S.A. v. USITC*, 718 F.2d 365, 376, 218 USPQ 678, 688 (Fed.Cir.1983); *Astra-Sjuco, A.B. v. USITC*, 629 F.2d 682, 686 (CCPA 1980); *Autogiro Co. of America v. United States*, 384 F.2d 391, 396–97, 181 Ct.Cl. 55, 155 USPQ 697, 702 (1967). The lead opinion, in contrast, uses the term "literal correspondence" to mean that the words of a claim are to be read in a vacuum,

basis for finding noninfringement, I believe that under the reverse doctrine of equivalents, the MEI device does not infringe SRI's asserted claims.

The lead opinion starts on the first page in its BACKGROUND section with this statement:

The district court's opinion contains an excellent explication of the technology involved, reflecting a clear recognition of the undisputed fact that the filter and camera embodiment *described in the specification* of SRI's United States Patent No. 3,378,633 (the '633 patent) issued ... April 16, 1968, *operate* somewhat differently from the MEI filter and camera accused of infringement. (Emphasis as in lead opinion).

Since there is disagreement in this case whether material facts are in dispute, instead of just referring to the district court opinion and merely stating that it contains an "excellent explication of the technology involved," I choose to quote the undisputed facts as found by the district court. It is significant that the lead opinion in its opening paragraph recognizes the "undisputed fact that the filter and camera embodiment described in the specification of SRI's United States Patent No. 3,378,633 (the '633 patent) issued ... April 16, 1968, operate somewhat differently" from the MEI filter and camera accused of infringement. The trial judge chose to find the undisputed material facts to be as follows:

"FACTS

"The '633 patent describes a method by which single tube color television cameras can perceive and transmit color images. Although the detailed technology of the patented and accused devices is complex, the gist of the '633 patent and its only teaching at issue in this action is the way in which a special light filter employs geometric principles to register the color of an object being televised. To understand how the filter facilitates color transmission, however, it is helpful to briefly note the functioning of the camera itself.

"1. *Background*

"Single tube television cameras operate by focusing the image to be televised onto a photosensitive image area in a part of the camera called a pick-up tube. The pick-up tube converts the image into a series of electrical signals by means of a sequence (or 'raster') of horizontal lines across the image area. The amplitude of the electrical signals varies according to the intensity of light at any given point on the image area. These signals are then transmitted to a receiver and used to reproduce, the original image on a television screen. When generated directly from the pick-up tube, the signals can record the intensity of the image but not its color.

"An image in color is made up of various light components: a general brightness component called 'luminance,' and components of each of the three primary colors: red, blue, and green. To reproduce an image in color, the pick-up tube of a television camera must subdivide the image area into three primary color areas so that electrical signals corresponding to each of these colors can be generated simultaneously by a single raster scan of the pick-up image area.

"Both systems at issue in this action accomplish color subdivision by placing a composite filter in front of the pick-up tube. The composite filter consists of two super-imposed filters each with a grid of different colored stripes. The stripes of one grid are yellow, a color that passes all light except blue (and is referred to as 'subtractive blue'), and the other's stripes are cyan, a color that passes all light except red (and is referred to as 'subtractive red'). As the scanning beam moves across the image over which the composite filter has been placed, the output signal generated includes two signal components representing the red and blue portions of the image. If the yellow stripes are of a different width than the cyan stripes, the beam of light moving at a constant speed will generate output signals of different

irrespective of specification, prosecution history or prior art. MEI has never conceded literal infringement in this case. Rather, MEI has

argued that there was no literal infringement of properly interpreted claims.

frequency for the light (i.e. colors) passing the yellow stripes than for that passing the cyan stripes. These output signals, which are said to have 'encoded' the color information from the image, are then 'decoded' by a series of electrical filters and ultimately used to reproduce the image on a television screen.

"2. *Prior Art: The Kell Patent*

"The way in which striped filters 'encode' color information is further explained by reference to U.S. Patent No. 2,733,291, issued in 1956 to Ray Kell for a color television camera ('the Kell Patent'), which both parties concede to be the most analogous prior art.

"Kell teaches the use of a composite filter consisting of two grids of stripes, one colored cyan and the other yellow as shown in Figure # 1:

Figure #1

The stripes on the two grids vary in width so that all the yellow stripes, of uniform width, are either wider or narrower than the cyan stripes, also of uniform width. As the scanning beam moves across the image area covered by the composite filter, the blue light component of the image is periodically interrupted when the beam passes over each yellow stripe. This periodic interruption generates an electrical signal rerpresenting the blue content of the image at a frequency corresponding to the frequency with which yellow (subtractive blue) appears in front of the image area.

At the same time the filter generates a signal representing the red content of the image at a frequency corresponding to the frequency of cyan (subtractive red) stripes.

"Under the Kell patent, because the cyan and yellow stripes vary in width, the frequency of the red and blue signals differ from each other and from the frequency of the luminance or general brightness component. Thus if the filter has more yellow stripes than cyan stripes, the frequency of the three light components can be diagrammed as appears in Figure # 2

Figure #2

where the horizontal axis represents frequency measured in megahertz (MHz) and the vertical axis represents amplitude or intensity of the light. Each color is said to have a 'carrier frequency' at the central hump of its frequency range and 'side bands' on either side of the carrier frequency. As can be seen, the luminance component has the lowest frequency range while the red and blue components have higher frequency ranges depending on the spacing of the subtractive color grids.

"The output signals thus generated are then 'decoded' by three electrical filters called 'low pass' and 'band pass' filters

which are able to separate out luminance, red, and blue signals by virtue of the variations in their carrier frequencies: In a process not relevant to this action, the green color component is obtained by subtracting out the blue and red components from the luminance component. The separated signals are then funnelled out through different output channels and are ultimately recombined to reproduce the colored image by means of a second scanning beam projected on the television screen.

"The Kell patent suggests a number of minor variations to this basic scheme, one of which is relevant to this action. Kell recognized that the superimposition of one vertical grid on another creates the possibility of 'beats' or 'moire' interference which takes the form of light and dark bands across the filter. The Kell patent teaches that moire interference can be reduced if the stripes are placed at an angle, rather than parallel, to one another. Fig-

ure 4D of the Kell patent shows striped grids so angled, and the specification explains that:

> the orientation of the different negative grids with respect to the scanning direction as shown in Figure 4D decreases any moire effects that might otherwise be produced.

### "3. The '633 Patent

"Plaintiff's '633 patent teaches basically the same system as Kell except that the two grids have stripes of equal width. The grids are placed at an angle to one another, however, so that as the scanning beam moves horizontally across the filter, the frequency ranges of the red and blue components will still differ. As shown in Figure # 3, the scanning beam moves across a yellow grid of 1 centimeter-wide stripes placed vertically on the pick-up tube.

Figure #3

1 cm.

In Figure # 4, it moves across a cyan grid of stripes also 1 centimeter wide but placed at a 45° angle to the vertical; the resulting distance traveled by the beam over each cyan stripe is, as a matter of pythagorean geometry, 1.4 centimeters.

Figure #4

The frequency range generated by the second grid for the red signal component would thus be lower than the frequency range generated by the first grid for the blue signal component. The frequency diagram for the '633 patent is thus identical to that of the Kell system in Figure # 2, and the signals are decoded by low- and band-pass filters just as in Kell.

"4. *The MEI System*

"The MEI camera also employs a composite filter of angled cyan and yellow striped grids with equally spaced stripes to encode color signals off a single pick-up tube. The grids of the MEI filter, however, are placed at equal and opposite angles to the vertical. As a result, the distance travelled by the scanning beam over the stripes of both grids is the same and no variation in frequency range is created between the blue and red components. The appearance of the frequency diagram is shown in Figure # 5:

Figure #5

"Because the MEI filter does not generate the frequency range variation between red and blue signal components based on stripe widths that vary in relation to the scanning movement, as taught by the Kell and '633 patents, the camera cannot decode the color components by means of band-pass filters. Instead, it employs what is called a 1–H delay line comb filter which separates the red and blue components by means of a complicated series of manipulations as follows. As the scanning beam moves across the first scan line over the filtered image, it creates signals of alternating red and blue zones as shown in Figure # 6:

Figure 16

---

These signals are said to be 'out of phase' because the red and blue components alternate rather than overlap. As the beam moves across the next line, however, it creates a signal of zones containing neither color alternating with zones containing both colors. Here the red and blue components are 'in phase' because they overlap rather than alternate. The 1–H delay line comb filter operates to delay the scan line signal just long enough for the filter to align it with the next scan line and then combine the two. Where the red signals in a given pair of aligned zones from two scan lines are in phase once the scan lines have been shifted and combined, and the blue signals are out of phase, the blue signals will cancel out and only the red will remain. Conversely, where the blue signals are in phase and the red out of phase, only the blue signal will remain. Thus the 1–H delay line comb filter uses the phase variation of the red and blue signals in alternating scan lines to separate out or decode the two colors. The luminance and green components are separated out in the same way as in the Kell and '633 patents, and the various signals recombined to reproduce the full color image on a television screen."

The lead opinion does not dispute any of the facts recited in the above trial judge's findings. In fact, it agrees that they were the facts. As I see it, then, the major weakness of the lead opinion lies in its failure to point, with convincing or useful specificity, to any material facts in dispute.

While recognizing that summary judgment is granted when there is no genuine issue of material fact, Fed.R.Civ.P. 56, the lead opinion asserts that MEI did not carry the burden required by the rule to establish the absence of a material fact issue in regard to the manner of operation of its device. I am at a loss, however, to determine from the lead opinion, an issue of material fact, supported by the record below, which precludes the court's grant of summary judgment. *See Barmag Barmer Maschinenfabrik AG v. Murata Machinery, Ltd.* 731 F.2d 831, 836, 221 USPQ 561, 564 (Fed.Cir.1984) (party opposing motion for summary judgment must point to evidentiary conflict created on the record; mere conclusory statements are insufficient). Suggestions by the lead opinion that evidence may be developed at trial is mere speculation and inappropriate in ruling on a Rule 56 motion. *First National Bank v. Cities Service,* 391 U.S. 253, 289, 88 S.Ct. 1575, 1592–93, 20 L.Ed.2d 569 (1968).

Furthermore, where, as here, the evidence on an issue leaves no room for any reasonable difference of opinion as to its resolution, the district court should resolve such issue, as it did in this case, as a matter of law. *See Jamesbury Corp. v. Litton Industrial Products, Inc.,* 756 F.2d 1556, 1560, 225 USPQ 253, 257 (Fed.Cir. 1985); *Williams v. Butler,* 746 F.2d 431, 440 (8th Cir.1984); *Trace X. Chemical v. Canadian Industries,* 738 F.2d 261, 265 (8th Cir.1984), *cert. denied,* —— U.S. ——, 105 S.Ct. 911, 83 L.Ed.2d 925; *B.D. Click Co., Inc. v. United States,* 614 F.2d 748, 755, 222 Ct.Cl. 290, 303 (1980); *Admiral Theatre Corp. v. Douglas Theatre Co.,* 585 F.2d 877, 893 (8th Cir.1978), *Simmonds Precision Products, Inc. v. United States,* 546 F.2d 886, 891, 212 Ct.Cl. 305, 315 (1976), *Gillette Diary, Inc. v. Hydrotex Industries, Inc.,* 440 F.2d 969, 971 (8th Cir.1971), *Sherwin v. U.S.,* 436 F.2d 992, 1002, 193 Ct.Cl. 962, 979 (1971).

I agree with the district court that the attempt to characterize the MEI camera as a "frequency" device rather than a "phase" device, hardly rises to the level of an evidentiary conflict as to the nature and operation of the accused product sufficient to preclude a grant of summary judgment. While it is true that frequency and phase are not synonymous terms, the court below is quite right in its conclusion that the application of one label rather than another does not detract from the fundamental distinction between MEI's use of a single frequency modulated carrier in its operation and SRI's use of a two frequency modulated carrier in the '633 patent.[2]

Since there was no dispute as to the manner in which the accused device operated, the district court correctly concluded that the question of infringement reduced to a construction of the scope of the claims asserted by SRI. This, of course, is a question of law. *SSIH Equipment, S.A. v. U.S. International Trade Commission,* 718 F.2d 365, 218 USPQ 678 (Fed.Cir.1983). The district court particularly considered the history of prosecution of SRI's '633 patent before the Patent and Trademark Office (PTO) and properly concluded that SRI, having argued a construction of the claims which emphasized the generation of frequency variation by angle differentiation, was precluded from arguing a construction which involves essentially no frequency variation for the purposes of infringement.

The lead opinion on this point takes the position that the district court misconstrued the nature and effect of the prosecution history and that, in essence, if SRI had relied for patentability over the Kell patent on the basis of the generation of two frequencies in a single pass of the scanning beam across light passing through the composite grid filter, the examiner would necessarily have rejected the claims as based on an admittedly old feature. In support, the lead opinion states that SRI never discussed in its Remarks to the PTO, a composite filter that generated only one modulating frequency and that SRI acknowledged that Kell generated two.

As I view it, during the prosecution of '633 patent, the principal argument made to distinguish the claimed invention from the Kell patent, the closest prior art, was SRI's contention that the Macovski filter "insures two different modulating frequencies by virtue of placing one grid at an angle to another grid," while Kell generated two different modulating frequencies by making "his line density different for each grid." This point is perhaps best illustrated by quoting, as does the lead opinion, from Remarks filed by SRI in response to the examiner's initial rejection of certain claims in view of Kell:

> Claim 1, as amended, distinguishes over Kell in calling for a spatial filter which is comprised of a first grid of parallel spaced lines having the color of a *subtractive primary,* and a second grid *which is relatively angularly superimposed over all of said first grid,* said second grid having parallel spaced lines which are the color of another *subtractive primary . . . .* Claim 1 further distinguishes over Kell in calling for each

**2.** I have considered the Ball affidavit but fail to understand how the experiments of Mr. Ball raise an issue of material fact when, on the undisputed record, the SRI and MEI cameras do not operate in substantially the same way. *Graver Tank & Manufacturing Co. v. Linde Air Co.,* 339 U.S. 605, 70 S.Ct. 854, 94 L.Ed. 1097, 85 USPQ 328 (1950). The Nakabe paper, referred to in the lead opinion on page 12 is even less convincing to show material facts in dispute. SRI asserts in this context, that Nakabe describes the MEI camera as a "single carrier-frequency division system" while describing a camera system such as that described in the '633 patent, as a "two carrier-frequency division sys-

tem". The mere use of the term "frequency", however, does not compel the result that the MEI system operates as a so-called "frequency" system. On the contrary, as the trial judge realized, the term "single carrier-frequency division system" simply means that the MEI system modulates a carrier wave with only one "single" modulating frequency. The term "two carrier frequency division system" as applied to the '633 patent only means that, in the system disclosed by the patent, a carrier wave is modulated with "two" modulating frequencies. The findings of the trial judge are in accord with Nakabe's descriptions.

grid to have the same line density. Every teaching in Kell, both in the specification and in the drawings, ... is that the line density is different for each grid. [Emphasis in original.]

The reason why Kell makes his line density different for each grid is that that is the way that he generates his two different modulating frequencies. This applicant insures two different modulating frequencies by virtue of placing one grid at an angle to another grid. As a result, the scanning beam, which traverses the line grids in successive parallel lines, is interrupted at two different frequencies by the two angularly disposed lines of the two grids.

The lead opinion is correct in noting that Macovski did not distinguish his own invention from Kell on the basis of Kell generating only one frequency in a single scan pass. There would be no reason to do so, of course, as Kell generated two modulating frequencies in a single scan pass and relied on such frequency variation to produce color information. Kell produced this frequency variation using unequal line densities in two separate grids of a filter. The '633 patent, in contrast, using equal line density grids, relies on a particular angular orientation of these grids to produce frequency variation. To avoid Kell, and yet produce the same color information, Macovski distinguished his invention on the basis of angular orientation of these grids, in contrast to their unequal line density as in Kell.

The lead opinion further concludes that SRI's Remarks to the PTO can only be applied in a structural, not operational context. I cannot agree. Having made narrowing arguments to the PTO to obtain allowance of a patent, SRI may not now seek a broader scope for its patent claims in an attempt to cover the MEI device. Moreover, arguments made to the PTO to define and explain the claimed invention for the purpose of distinguishing it from the prior art limit the proper interpretation of the claim language, whether or not actual amendments to the claim language are made and whether or not the lead opinion chooses to classify such arguments as "structural" or "operational" in nature. *Coleco Industries, Inc. v. U.S. International Trade Commission*, 573 F.2d 1247, 197 USPQ 472 (CCPA 1978). As stated by the Court of Customs and Patent Appeals in *Coleco:*

A response to an examiner's office action may include an amendment accompanied by remarks or it may include only remarks. Because applicant's ultimate goal in submitting amendments and offering arguments in support thereof is the securing of a patent, we find no reason not to extend the traditional estoppel doctrine beyond estoppel by amendment to estoppel by admission.

573 F.2d at 1258, 197 USPQ at 480.

I add further on this point, that the lead opinion, in concluding that SRI could not have properly relied for patentability over Kell on the basis of the generation of two different frequencies in a single scan pass across the composite grid filter is outside its rightful purview. Since the district court did not rule on the validity of the '633 patent, this Court may not attempt to circumscribe any future resolution of that issue. *See Structural Rubber Products v. Park Rubber*, 749 F.2d 707, 223 USPQ 1264 (Fed.Cir.1984).

In a related holding, the lead opinion concludes that the district court, in interpreting the asserted claims in light of the specification, improperly read limitations into them from other claims and in so doing, erred as a matter of law. I take a different position.

It is axiomatic that claims of a patent must always be interpreted in light of the specification. *Autogiro Company of America v. United States*, 384 F.2d 391, 181 Ct.Cl. 55, 155 USPQ 697 (1967). This is not to say, of course, as the lead opinion correctly notes, that an applicant in his specification must describe every conceivable and possible future embodiment of his invention. *Raytheon Co. v. Roper Corp.*, 724 F.2d 951, 957, 220 USPQ 592, 597 (Fed. Cir.1983). But where, as here, the specifi-

cation does not refer to an angular orientation of the grids of the filter as only a "best mode" for utilizing the invention, but rather teaches this arrangement as essential to achieve the objects of the invention, I am satisfied, as was the trial judge, that the invention has not been improperly limited.

In this case, the specification of the '633 patent teaches that the angles and orientation of the two grids of the filter are chosen so as to produce adequate separation between the blue and red frequency components of the modulated carrier. The specification provides no other basis for selecting the angle or orientation of the filter's grids. SRI's argument that the phrase "relatively angularly superimposed", appearing in its asserted claims should be read to mean merely that the grids of the filter must be crossed at any angle, was properly rejected by the lower court which inspected the specification of the '633 patent and concluded in light thereof, that the grids of the filter must be angled to generate frequency variation for red and blue color signals. Nevertheless, the lower court's correct interpretation of the claims in light of the specification is mischaracterized in the lead opinion as an improper exercise whereby the limitations of narrow claims are read into broader claims.

Finally, I believe that the district court properly held that the MEI device "cannot be found to do the same work in the same way" as the device claimed in the '633 patent. Considered as a whole, the record shows that the MEI device operates in a fundamentally different way from the SRI filter, produces a different electrical signal and requires entirely different signal processing. That the two devices ultimately produce an image should not obscure the fact of how each accomplishes this result since numerous devices which could never reasonably be argued to be equivalents also produce images. Under these circumstances, according to the reverse doctrine of equivalents, the MEI device cannot be found to infringe. *Westinghouse v. Boyden Power Brake Co.*, 170 U.S. 537, 18 S.Ct. 707, 42 L.Ed. 1136 (1898). *Leesona v.*

*U.S.*, 530 F.2d 896, 906, 208 Ct.Cl. 871 (1976) ("more than a literal response to the terms of the claims must be shown to make out a case of infringement.") Since the question of infringement in this case is resolved on an undisputed fact record, the application of the reverse doctrine of equivalents is a matter of law. *Kalman v. Kimberly Clark Corp.*, 713 F.2d 760, 218 USPQ 781 (Fed.Cir.1983); *see also Sanitary Refrigerator Co. v. Winters*, 280 U.S. 30, 36, 50 S.Ct. 9, 10–11, 74 L.Ed. 147 (1929) ("upon the undisputed evidence the question of infringement resolves itself ... into one of law, depending upon a comparison between the structure disclosed on the face of the patent and the [accused device] ... and the correct application thereto of the rule of equivalency.")

I dissent lastly from the lead opinion statement of reasons for *in banc* action. This case was not taken *in banc* to exclusively consider overruling *Kalman*. Rather, in addition to the *Kalman* issue, the *in banc* action was taken to determine whether summary judgment was improperly granted by the lower court and whether the lower court impermissibly denied SRI a jury trial.

Based on the foregoing, I would affirm the decision of the district court.

In view of the disposition of the case as suggested herein, notwithstanding the fact that there has been no clear and definitive ruling by the district court denying a request for a jury trial, *see Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–47, 50 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936), I believe it unnecessary to go into the question of the right to a jury trial in complex cases. The Third Circuit has stated that, in exceptional circumstances, the right to jury trial may be denied due to the "complexity" of the suit, *see In re Japanese Elec. Prod. Antitrust Litigation*, 631 F.2d 1069 (3rd Cir.1980), while the Ninth Circuit has rejected such a "complexity" exception in *In re U.S. Financial Securities Litigation*, 609 F.2d 411, 432 (9th Cir. 1979), *cert. denied*, 446 U.S. 929, 100 S.Ct.

1866, 64 L.Ed.2d 281 (1980). The lead opinion in an addendum takes the Ninth Circuit views. It is a complicated question of Constitutional law, mooted in this case by the disposition I suggest.