STERLING DRUG, INC. and Cook–Waite Laboratories, Inc.

v.

INTERMEDICS, INC., Carbomedics, Inc., Intermedics, Orthopedics, Inc., Calcitek, Inc., and Dr. Michael Jarcho.

Civ. No. A–82–CA–578.

United States District Court, W.D. Texas, Austin Division.

April 27, 1987.

William H. Daniel, Lloyd Lochridge, McGinnis, Lochridge & Kilgore, Austin, Tex., John R. Schiffhauer & Bruce A. Pokras, William S. Feiler, John D. Foley, Christopher E. Chalsen, John F. Sweeney, Morgan, Finnegan, Pine, Foley & Lee, New York City, V. Bryan Medlock, Jr., Richard, Harris & Medlock, Dallas, Tex., for plaintiff.

Michael Lawrence, David H. Donaldson, Graves, Dougherty, Hearon & Moody, Austin, Tex., John F. Flannery, Chicago, Ill., for defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW ON PROSECUTION HISTORY ESTOPPEL

NOWLIN, District Judge.

### A. FINDINGS OF FACT

#### Process Claims of Jarcho Patent

1. The great-grandparent application of the Jarcho patent, Serial Number 494,240, contained process claim 3, which read as follows:

3. A process for producing an article of manufacture according to Claim 1 which comprises the steps of reacting calcium nitrate with ammonium phosphate in aqueous medium to produce a precipitate of hydroxylapatite, separating said precipitate from the solution and drying it until the water content thereof is reduced to about 0 to 2 percent, and heating the dried solid thus obtained at about 1000° C. to 1250° C. for approximately 20 minutes to 3 hours.

2. This claim was rejected by the U.S. Patent and Trademark Office ("PTO") as obvious over the prior art.

3. Sterling argued, in an amendment, that "[a]pplicant was the first to recognize the advantage of sintering a hydroxylapatite gel and by so-doing produced ... a novel ceramic form of hydroxylapatite...."

4. The Examiner again rejected claim 3 on the prior art and made the rejection final.

5. The primary reference relied upon by the Examiner was an article by Kutty, which the Examiner held "teaches that it is old to react calcium nitrate with ammonium phosphate at a pH of 12 and dry the resultant precipitate." The dried mass is then heated at 850° C. for one hour and for twenty hours at 1050° C., 1150° C. 1150° [sic] and 1250° C., respectively.

6. The grandparent application, Serial No. 593,303 was filed on July 7, 1975, and contained independent process claim 4, which read as follows:

4. The process which comprises the steps of reacting calcium ion with phos-

phate ion in aqueous medium at a pH of 10–12 to produce a precipitate of hydroxylapatite, having a molar ratio of calcium to phosphorus in the approximate range 1.62–1.72, separating said precipitate from the solution, heating said precipitate up to a temperature in the approximate range 1050° C. to 1250° C. and maintaining said temperature for approximately 20 minutes to 3 hours.

Hence Sterling replaced the step of "heating the dried solid ..." with the step of "heating said precipitate"; thus, Sterling abandoned one of the disclosed embodiments of the process which included the step of heating the dried solid, and limited the claim to the disclosed embodiment which included the step of heating the precipitate itself without drying.

7.  Even with the limitation of "heating such precipitate," this claim was rejected by the Examiner as being obvious over the same prior art—the Kutty reference. At a subsequent interview with the Examiner, Sterling argued that the prior art Kutty process included the "additional step of powdering the hydroxylapatite prior to heating" and thus was to be contrasted with the Jarcho specification which "clearly teaches that particulate or granular hydroxylapatite cannot be used to produce the claimed ceramic." Sterling flatly stated that the inclusion of "the step of powdering the hydroxylapatite would render the Kutty process incapable of producing [Jarcho's] invention." This was alleged, in a proposed response handed to the Examiner prior to the interview, to be consistent with the teaching of the Jarcho specification:

> It is critical in the above process to prepare hydroxylapatite as a gelatinous precipitate from aqueous solution for it is only in this cohesive gelatinous state that hydroxylapatite can be shaped or molded and then dried and sintered to produce a ceramic body in macroform.... [A]lthough powdered hydroxylapatite can be mechanically compressed into a shaped body, such as a tablet, when sintered according to the method of this invention the product obtained is highly porous....

8.  Sterling additionally argued in the proposed response that "Applicant was the first to recognize the advantage of sintering a hydroxylapatite gel and by so doing has produced a new and unexpected result, i.e., a novel ceramic form of hydroxylapatite having unique and advantageous properties."

9.  To be consistent with the argument which Sterling was making as to the difference and advantages over the Kutty reference, the Examiner suggested that the independent process claim 4 be amended so as to call for producing a gelatinous precipitate, separating said gelatinous precipitate and heating said gelatinous precipitate.

10.  Following the interview, an amendment was filed in the PTO whereupon process claim 4 was amended to read as follows, specifically adding the word "gelatinous" as had been suggested by the Examiner at the interview:

> 4.  A process for producing an article of manufacture according to claim 1 which comprises the steps of reacting calcium ion with phosphate ion in aqueous medium at a pH of 10–12 to produce a gelatinous precipitate of hydroxylapatite, having a molar ratio of calcium to phosphorus in the approximate range 1.62–1.72, separating said gelatinous precipitate from solution, heating said gelatinous precipitate up to a temperature in the approximate range 1050° C. to 1250° C. and maintaining said temperature for approximately twenty minutes to three hours.

11.  In the remarks section of this amendment, it was pointed out that the process claims had indeed been amended at the request of the Examiner. This request on behalf of the Examiner was made for the purpose of distinguishing the Jarcho process from similar processes where material was powdered prior to sintering or powdered and compacted prior to sintering.

12.  Shortly after filing this amendment, the parent application, Serial No. 707,315, was filed with a further revised version of the process claim, as independent claim 10. In pertinent part, that claim was closely

patterned after amended claim 4 of the grandparent application, and retained the recitation with respect to heating the gelatinous precipitate. It read as follows:

10. The process which comprises reacting calcium ion with phosphate ion in aqueous medium at a pH of about 10–12 to produce a gelatinous precipitate of a phosphate of calcium having a molar ratio of calcium to phosphorus between the approximate molar ratio of calcium to phosphorus in whitlockite and that in hydroxylapatite, separating said gelatinous precipitate from solution, heating said gelatinous precipitate up to a temperature of at least approximately 1000° C. but below that at which appreciable decomposition of hydroxylapatite occurs, and maintaining said temperature for sufficient time to effect the sintering and substantially maximum densification of the resulting product.

13. Before the PTO acted on the parent application, the final application, Serial No. 764,266, was filed on January 31, 1977. It contained a claim 10 which was identical to that in the parent application. When the final application was examined, the Examiner rejected the article of manufacture claims, including claim 11.

14. The inclusion of the recitation "heating said gelatinous precipitate" was crucial to obtaining the allowance of all the process claims. The prosecution shows that the meaning Sterling ascribed to this phrase at that time was one of initially producing a cohesive gel material by precipitation and then sintering the material while it remains in that cohesive state. In the Jarcho, et al *Journal of Materials Science* article, that was submitted to the Examiner as evidence of the unique properties and utility of Jarcho's invention, this critical step was described as follows: "During the drying of the precipitated hydroxylapatite the crystals compact like clay to produce a green state that is devoid of pore-producing aggregates normally present in compacts prepared from dried powders."

### Article Claims of Jarcho Patent

15. The Jarcho great-grandparent application was filed with Article claim 1, which read as follows:

1. As an article of manufacture, a strong, hard, dense, white, translucent ceramic comprising substantially pure microcrystalline hydroxylapatite in a random, isotropic array and having a compression strength in the approximate range 35,000 to 75,000 psi, a tensile strength in the approximate range 3,000 to 50,000 psi, a linear thermal coefficient of expansion in the approximate range 10 to 12 ppm per degree centigrade, a Knoop hardness in the approximate range 470 to 500 and a modulus of elasticity of approximately $6 \times 10^6$ psi, and being characterized by cleavage along smooth curved planes, and by the absence of birefringence under polarized light.

16. This claim was rejected as being obvious in view of the prior art. Sterling argued in an amendment that the prior art lacked "the high strength properties of [Jarcho's] dense, nonporous ceramic...." The Examiner then rejected claim 1 as being obvious over Kutty in view of other prior art and made the rejection final.

17. Subsequent to such final rejection, the grandparent application containing a new claim 1 was filed which read as follows:

1. As an article of manufacture, a translucent, isotropic, polycrystalline, sintered ceramic comprising substantially pure hydroxylapatite having an average crystallite size in the approximate range 0.2 to 3 microns, a density in the approximate range 3.10 to 3.14 g/cm$^3$ and being further characterized by the absence of pores and by cleavage along smooth curved planes.

The broad limitation "dense" was abandoned, and the narrow limitations "a density in the approximate range 3.10 to 3.14 g/cm$^3$ and being further characterized by "the absence of pores" were substituted.

18. This claim was again rejected as being obvious in view of the same prior art. Thereafter, the Examiner was then personally interviewed by the Sterling patent agent. An amendment was then filed ar-

guing the patentability of the claim. Shortly after the filing of this amendment, the parent application was filed. A further revised version of article of manufacture claim 1 was submitted having a new density limitation, which claim read as follows:

1. As an article of manufacture, substantially pure hydroxylapatite in the form of a translucent, isotropic, polycrystalline, sintered ceramic having an average crystalline size in the approximate range 0.2 to 3 microns, a density greater than approximately 98 percent of the theoretical density of hydroxylapatite and being further characterized by the absence of pores and by cleavage along smooth curved planes.

Thus, the limitation "a density in the approximate range 3.10 to 3.14 g/cm$^3$ was replaced by "a density greater than approximately 98 percent of the theoretical density of hydroxylapatite."

19. Prior to the PTO acting on the parent application, the final application was filed containing a claim 1 which was the same as claim 1 in the parent application. The Examiner rejected claim 1 of the final application for the same reasons earlier employed in the rejection of the predecessor claim 1 in the grandparent application.

20. Sterling conducted a personal interview with the Examiner and filed a copy of the record of that interview in late October 1977. At the interview, Sterling stated that the typical prior art ceramic prepared by the powder compaction method is porous, whereas the Jarcho product "is completely nonporous, i.e., substantially 100% dense." The Examiner was left a copy of the Jarcho and Doremus article from the *Journal of Materials Science*, Vol. 11, which Sterling asserted as describing the "unique properties of Applicant's ceramic." The article criticizes the prior art hydroxylapatite materials as containing many fine pores. The article points out that one of the unique properties is that the Jarcho ceramic is free of fine pores. Illustrations were given in the Jarcho article of ceramics which showed no pores and which had a measured density within experimental error of the theoretical density. The Jarcho article concludes by referring to the lack of fine pores in the fired samples.

21. An amendment was filed by Sterling on November 10, 1977, and a Supplemental Response was filed on December 19, 1977, together with copies of the electron photomicrographs of Jarcho's ceramic that, at the most recent personal interview, Sterling had shown the Examiner as illustrating the "completely nonporous, i.e., substantially 100% dense" unique property of the Jarcho ceramic. Sterling again pointed out that the photomicrographs show the "absence of fine pores" and this is "evidence of the novel and unobvious nature of [Jarcho's] claimed hydroxylapatite ceramic." The claims to the article of manufacture were then allowed by the Examiner in view of the communications that were filed in November and December of 1977, which emphasized the dense, pore-free, i.e. absence of fine pores) nature of the novel ceramic.

22. It is clear from examination of the prosecution history that claim 1 to the article of manufacture and its dependent claims were allowed over the prior art only after: 1) the claims were amended to limit the density to "a density greater than approximately 98 percent of the theoretical density of hydroxylapatite and being further characterized by the absence of pores," 2) the personal interview at which the Examiner was shown photomicrographs illustrating a total absence of pores in the ceramic material, and 3) receipt of the Jarcho articles which emphasized the pore-free nature of the Jarcho ceramic.

### The Gorman Patent

23. Claim 1 of the Gorman patent, as originally filed, reads as follows:

1. A mixing/dispensing syringe for use in the extrusion of a semiplastic mass which comprises in combination:

A. a barrel which is closed at its upper end by

B. a piston slidable within the bore of said barrel and

C. a plunger rod,

wherein the bore of said barrel is flared from its upper to its lower end.

24. By a preliminary amendment filed November 22, 1982 Sterling began narrowing the claims and presenting arguments distinguishing the narrowed claims from the prior art.

25. The preliminary amendment introduced to claim 1 the limitation that the barrel have "generally uniform wall thickness." At page 3 of the amendment, Sterling explained the limitation by stating "the barrel wall, although flared, is of uniform thickness," thus Sterling defined the expression "generally uniform" as meaning "uniform."

26. Sterling further argued that the claimed uniform wall thickness distinguished its invention from the De Lorenzo patent, No. 3,227,161. In making its argument, Sterling stated that the De Lorenzo patent discloses a syringe in which "the bore of the barrel is gradually and progressively enlarged ... and the other diameter of the barrel is gradually diminished from the inlet to the outlet...." This construction results in wall thickness which decreases toward the outlet end. Sterling argued in attempting to distinguish over the De Lorenzo patent:

> In contrast to the De Lorenzo syringes, those provided by the instant invention have a barrel of uniform thickness, the external taper present in the De Lorenzo syringes being absent....

27. By making claim amendments and arguments in an attempt to distinguish its syringe from a similar one having an external taper, Sterling adopted a narrow construction of the expression, "generally uniform wall thickness," and reaffirmed this construction later in the prosecution. Sterling cannot now argue for a different interpretation of its claims.

### CONCLUSIONS OF LAW

■ 1. File wrapper estoppel prevents a patentee from recapturing what he has given up, by amendment to the claims or argument as to patentability, during the prosecution of the application which issued as the patent in suit. *Builders Concrete v. Bremerton Concrete Products Company,* 757 F.2d 255 at 258–60; *Prodyne Enter-*prises v. Julie Pomerantz, Inc., 743 F.2d 1581, 1583 (Fed.Cir.1984); *Coleco Industries v. U.S. International Trade Commission, et al.,* 573 F.2d 1247 (C.C.P.A. 1978).

■ 2. Whether the doctrine of equivalents is available for application in a particular case is a matter of claim interpretation or construction, which is a matter of law. *SRI International v. Matsushita Electric Corp. of America,* 775 F.2d 1107, 1118 (Fed.Cir.1985).

■ 3. Sterling inserted the language "heating said gelatinous precipitate" for the purpose of distinguishing the claimed process from prior art processes wherein the heated precipitate was dried powder or a compaction of that powder was employed. Thus, Sterling cannot, at a later date, assert that such a term is not crucial and may be broadened through the Doctrine of Equivalents to include what had been abandoned.

■ 4. The Doctrine of File Wrapper Estoppel is applicable on this point. The Sterling process claims can be infringed only by a process wherein a gelatinous precipitate is heated to form a ceramic without drying and powdering the precipitate or without compressing the powdered precipitate.

5. The Doctrine of File Wrapper Estoppel is likewise applicable to claim 11, which contains the limitation: "maintaining said temperature for approximately 20 minutes to 3 hours," because this claim was allowed after Sterling asserted in distinguishing over the Kutty reference that "[Jarcho's] material is heated no more than 3 hours." Sterling cannot contend that a process which heats for over 3 hours is equivalent.

6. In view of the emphasis which was made during the prosecution of the Jarcho patent on the greater than 98% dense, pore-free character of the ceramic, the limitations of "a density greater than approximately 98% of the theoretical density of hydroxylapatite and being further characterized by the absence of pores," are crucial limitations which must be present in an allegedly infringing material. Expansion

of these limitations necessary for patentability through the Doctrine of Equivalents is not available.

7. The Gorman claims cannot now cover syringes having non-uniform wall thickness, particularly if the wall thickness varies due to the combination of internal and external taper.

8. For the reasons set forth above, the doctrine of equivalents is inapplicable to the limitations of "heating said gelatinous precipitate" in the Jarcho process claims; "characterized by the absence of pores" and "a density greater than approximately 98% of the theoretical density of hydroxylapatite" in the Jarcho article claims; and the limitation of "generally uniform wall thickness" in the Gorman patent.